No. 25-1922

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

—————————

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United
States of America, et al.,

Defendants-Appellants.

—————————

On Appeal from the United States District Court
for the Western District of Washington

—————————

## BRIEF FOR APPELLANTS

—————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACOB CHRISTENSEN
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ........................................................ 3

STATEMENT OF THE ISSUES ............................................................ 3

PERTINENT STATUTES AND REGULATIONS .................................... 4

STATEMENT OF THE CASE .............................................................. 5

    A.    The Executive Orders .............................................................. 5

    B.    Proceedings Below .................................................................. 8

SUMMARY OF ARGUMENT .............................................................. 11

STANDARD OF REVIEW .................................................................. 14

ARGUMENT .................................................................................... 15

I.    Plaintiffs Have No Likelihood of Success on the Merits of the
Sweeping Facial Claims They Asserted ....................................... 16

    A.    The President acted within his authority in issuing the
Executive Orders .................................................................. 17

        1.    The President properly exercises supervisory
authority over the Executive Branch .......................... 21

        2.    The district court misconstrued the Executive
Orders .................................................................... 28

    B.    The Executive Orders do not discriminate based on sex
or transgender status ............................................................ 38

1.   The Supreme Court in *Skrmetti* upheld a state
           law prohibiting the same interventions at issue
           here for minors .............................................................. 40

      2.   The Executive Orders are materially
           indistinguishable from the Tennessee law upheld
           in *Skrmetti* .................................................................... 44

      3.   *Skrmetti* confirms that the Executive Orders have
           a rational basis for their classifications ..................... 52

II.   Plaintiffs Also Failed to Establish the Remaining
      Preliminary Injunction Factors .................................................. 58

III.  At Minimum, the District Court's Multi-Statewide
      Injunction Is Overbroad ................................................................ 60

CONCLUSION ............................................................................................ 63

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ............................................................. 39

*Advanced Integrative Med. Sci. Inst., PLLC v. Garland*,
    24 F.4th 1249 (9th Cir. 2022) ........................................... 23

*AFGE v. Trump*:
    139 F.4th 1020 (9th Cir. 2025) ......................................... 36
    No. 25-cv-03698-SI, 2025 WL 1482511 (N.D. Cal. May 22, 2025) .... 36

*Associated Gen. Contractors of Cal., Inc. v. City & Cnty. of San
    Fransisco*, 813 F.2d 922 (9th Cir. 1987) ........................... 55

*Building & Constr. Trades Dep't v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ........................... 22, 24, 25, 36

*California Hum. Dev. Corp. v. Brock*,
    762 F.2d 1044 (D.C. Cir. 1985) ........................................ 25

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ........................... 33, 34, 35, 46

*Clark v. Jeter*,
    486 U.S. 456 (1988) .................................................. 39, 40

*Crouch v. Anderson*,
    No. 24-90, 2025 WL 1787678 (U.S. June 30, 2025) ......... 49

*Davis v. Passman*,
    442 U.S. 228 (1979) ........................................................ 39

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ........................................................ 54

iii

*Federal Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................ 20

*Folwell v. Kadel*,
   No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025) .......................... 49

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) .......................................... 22

*Gorbach v. Reno*,
   219 F.3d 1087 (9th Cir. 2000) ........................................ 14

*Harris v. Board of Supervisors, Los Angeles Cnty.*,
   366 F.3d 754 (9th Cir. 2004) ........................................ 15

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024), *cert. granted*,
   No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) ........................ 50-51

*INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*,
   510 U.S. 1301 (1993) ........................................ 59

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) ........................................ 49

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023), *aff'd*,
   145 S. Ct. 1816 ........................................ 49, 51

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ........................................ 25, 26

*Little v. Hecox*,
   No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) ........................ 51

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ........................................ 14

*Moody v. NetChoice, LLC,*
 603 U.S. 707 (2024) .................................................................. 37, 38

*Morton v. Ruiz,*
 415 U.S. 199 (1974) ......................................................................... 25

*Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship,*
 918 F.3d 353 (4th Cir. 2019) ............................................................ 58

*Myers v. United States,*
 272 U.S. 52 (1926) ...................................................................... 21, 22

*New York v. Ferber,*
 458 U.S. 747 (1982) ......................................................................... 59

*Nken v. Holder,*
 556 U.S. 418 (2009) ......................................................................... 59

*Nuclear Regul. Comm'n v. Texas,*
 145 S. Ct. 1762 (2025) ......................................... 19-20, 20, 28, 29, 30

*Polselli v. IRS,*
 598 U.S. 432 (2023) ......................................................................... 33

*Proposed Executive Order Entitled "Federal Regulation,"*
 5 Op. O.L.C. 59 (1981) .................................................................... 22

*Reno v. Flores,*
 507 U.S. 292 (1993) .................................................................... 20, 29

*Scoggins v. Lee's Crossing Homeowners Ass'n,*
 718 F.3d 262 (4th Cir. 2013) ....................................................... 21, 29

*Sherley v. Sebelius,*
 644 F.3d 388 (D.C. Cir. 2011) ......................................................... 27

v

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ........................................................ 26

*Trump v. AFGE,*
   No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) ...... 17, 18, 19, 36

*Trump v. CASA, Inc.,*
   Nos. 24A884, 24A885, 24A886,
   2025 WL 1773631 (U.S. June 27, 2025) .......... 3, 14, 59-60, 60, 61, 62

*United States v. Skrmetti,*
   145 S. Ct. 1816 (2025) ................... 2, 13, 40, 41, 42, 43, 44, 45, 48, 49,
                             51, 52, 53, 54, 55, 56, 57, 58, 59

*United States v. Stewart,*
   311 U.S. 60 (1940) ........................................................ 23

*Wachovia Bank v. Schmidt,*
   546 U.S. 303 (2006) ........................................................23

*Weinberger v. Wiesenfeld,*
   420 U.S. 636 (1975) ........................................................ 39

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................ 15

## U.S. Constitution:

Art. II, § 1, cl. 1 ........................................................ 21

Art. II, § 3 ........................................................ 21

Amend. XIV, § 1 ........................................................ 39

## Statutes:

Public Health Service Act:
   42 U.S.C. § 241 *et seq.* ........................................................ 26
      42 U.S.C. § 241(a) ........................................................ 26

42 U.S.C. § 241(a)(3) ............................................................ 26
42 U.S.C. § 241(b)(1) ............................................................ 26
42 U.S.C. § 241(b)(3) ............................................................ 26
42 U.S.C. § 241(c) ................................................................ 26
42 U.S.C. § 247b .................................................................. 26
42 U.S.C. § 247b(a) .............................................................. 27
42 U.S.C. § 247b(k) .............................................................. 27
42 U.S.C. § 284(b)(2) ............................................................ 26
42 U.S.C. § 300u-1 ............................................................... 26
42 U.S.C. § 300u-2 ............................................................... 26
42 U.S.C. § 300u-3 ............................................................... 26

28 U.S.C. § 1292(a)(1) ............................................................ 3

28 U.S.C. § 1331 ................................................................... 3

28 U.S.C. § 1346 ................................................................... 3

**Regulatory Materials:**

45 C.F.R. § 75.210(b)(1)(ii) ..................................................... 27

45 C.F.R. § 75.300(a) ............................................................ 27

*Defending Women from Gender Ideology Extremism and*
*Restoring Biological Truth to the Federal Government,*
90 Fed. Reg. 8615 (Jan. 30, 2025) ................. 5, 6, 17, 23, 31, 32, 35, 57

Exec. Order No. 14,210, § 3(c),
90 Fed. Reg. 9669 (Feb. 14, 2025) ...................................... 18

*Protecting Children from Chemical and Surgical Mutilation,*
90 Fed. Reg. 8771 (Feb. 3, 2025) ........................... 5, 6, 7, 17, 23, 24, 31,
32, 35, 44, 46, 47, 49, 54

**Rule:**

Fed. R. Civ. P. 65(d) ............................................................ 63

vii

**Other Authority:**

Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (Apr. 2024) ................53

## INTRODUCTION

The district court entered a multi-statewide preliminary injunction against Executive Orders issued by President Trump in which he directed federal agencies under his supervision to exercise their discretion, to the extent they may do so consistent with applicable law, to avoid the federal funding of gender ideology and specified sex transition interventions for children under age 19. This lawsuit, filed barely two weeks after the President issued the Executive Orders, does not challenge any agency action taken in response to the Executive Orders, but is premised instead on hypothetical actions agencies might take based on as-yet-unidentified statutory authorities. Indeed, plaintiffs do not invoke any statutory cause of action at all. Rather, they have asserted sweeping "facial," *ultra vires* challenges to the Executive Orders on the purported ground that they violate Constitutional separation of powers and the Fifth Amendment's equal protection guarantee. The district court's ruling that plaintiffs are likely to succeed on the merits of these claims suffers from multiple legal errors.

For one thing, plaintiffs failed to satisfy the heavy burden applicable to their facial, *ultra vires* challenge, which required them to show that no set of circumstances exists under which any agency could take any hypothetical action to carry out the policies of the Executive Orders that is even plausibly within its statutory and constitutional authority. Federal agencies often have discretion, within the limits Congress has established, to determine priorities for federal funds or to take other discretionary steps with respect to funding, and the President may direct them to exercise that discretion in a particular way. That is all the Executive Orders here do. They are not self-executing and do not themselves terminate any funding but instead direct agencies to implement the policies therein consistent with applicable law, and they reflect a proper exercise of the President's supervisory authority over the Executive Branch.

Furthermore, plaintiffs' claim that the Executive Orders violate the Fifth Amendment's equal protection guarantee is foreclosed by the Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (June 18, 2025), which held that a Tennessee law addressing materially indistinguishable sex transition interventions on minors did

2

not classify based on sex or "transgender status" and did not violate

equal protection. *Skrmetti* controls here.

The district court's preliminary injunction rests on multiple legal

errors and should be vacated in its entirety. At minimum, the district

court's "statewide" injunction extending relief to nonparties across four

states is overbroad under *Trump v. CASA, Inc.*, Nos. 24A884, 24A885,

24A886, 2025 WL 1773631 (U.S. June 27, 2025), and cannot stand.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C.

§§ 1331 and 1346. (ER-65.) The district court granted in part and

denied in part plaintiffs' motion for a preliminary injunction on

February 28, 2025 (ER-58), and the government timely appealed on

March 21, 2025 (ER-109–110). This Court has jurisdiction under 28

U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Executive Order 14,168 directs federal agencies to take necessary

steps "as permitted by law" to assess grant conditions and grantee

preferences to ensure that federal grant funds do not promote "gender

ideology." Executive Order 14,187 directs agencies that provide

3

research or education grants to medical institutions to take appropriate steps "consistent with applicable law" to ensure that institutions receiving federal research or education grants end the "chemical and surgical mutilation" of children. The district court entered a preliminary injunction enjoining defendants from implementing these directives.

This appeal presents the following issues:

(1)    Whether the district court erred in concluding that plaintiffs had a likelihood of success on their claim that the Executive Orders were facially *ultra vires*;

(2)    Whether plaintiffs faced irreparable harm and satisfied the remaining preliminary injunction factors; and

(3)    Whether the district court's multi-statewide preliminary injunction is at minimum overbroad.

## PERTINENT STATUTES AND REGULATIONS

Pertinent authorities are reproduced in the addendum to this brief.

4

## STATEMENT OF THE CASE

### A.    The Executive Orders

On January 20, 2025, President Trump signed Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (the "Defending Women EO").  And, on January 28, 2025, the President signed Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Feb. 3, 2025) (the "Protecting Children EO").

The Defending Women EO establishes that "the policy of the United States [is] to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality."  Preamble, § 2.  Section 3(e) of the Defending Women EO states:  "Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."  Section 3(g) of the Defending Women EO likewise states:  "Federal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."  The Defending Women EO defines "gender ideology" to

5

include "the idea that there is a vast spectrum of genders that are disconnected from one's sex," with the term "sex" referring to "an individual's immutable biological classification as either male or female." § 2(a), (f). The final section of the Defending Women EO reiterates: "This order shall be implemented consistent with applicable law and subject to the availability of appropriations"; and "[n]othing in this order shall be construed to impair or otherwise affect … the authority granted by law to an executive department or agency." § 8(a), (b).

The Protecting Children EO declares the "policy of the United States" to be "that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another." § 1. Section 4 of the Protecting Children EO states:

> *Defunding Chemical and Surgical Mutilation.* The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

The Protecting Children EO defines the term "child" or "children" to mean "an individual or individuals under 19 years of age." § 2(a). And it defines the "chemical and surgical mutilation" of children to mean "the use of puberty blockers … to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; "the use of sex hormones … to align an individual's physical appearance with an identity that differs from his or her sex"; and "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." § 2(c). The Protecting Children EO further states that these chemical and surgical interventions are sometimes "referred to as 'gender affirming care.'" *Id.*

Like the Defending Women EO, the final section of the Protecting Children EO makes clear that "this order shall be implemented consistent with applicable law and subject to the availability of appropriations," § 11(b), and that "nothing in this order shall be construed to impair or otherwise affect … the authority granted by law to an executive department or agency," § 11(a).

7

### B.    Proceedings Below

Plaintiffs—four States (Washington, Oregon, Minnesota, and Colorado) and three individual physicians (ER-66–67)—filed this lawsuit on February 7, 2025, just over two weeks after the President signed the Executive Orders, and then filed an amended complaint on February 19, 2025.  (ER-59–106.)  The complaint named as defendants President Trump, 15 federal agencies, and the heads of those agencies. (ER-69–75.)

As relevant here, the complaint alleges that the Executive Orders terminate funding to educational and medical institutions operated by the plaintiff states that provide sex transition interventions to children under age 19.  (ER-61–63, ER-68.)  The complaint also alleges that the Executive Orders threaten the plaintiff physicians' medical institutions with the loss of federal grants if the physicians continue to provide sex transition interventions to patients under age 19.  (ER-67–69, ER-86–87.)  The complaint asserts facial, *ultra vires* claims that Section 4 of the Protecting Children EO and Sections 3(e) and 3(g) of the Defending Women EO violate the Constitution's separation of powers and the Fifth

8

Amendment's equal protection guarantee.[1]  (ER-100–102.)  For relief, the complaint seeks a declaration that the Executive Orders are unlawful and injunctive relief enjoining defendants "from implementing or enforcing Section[] 4 … of the [Protecting Children EO] and Sections 3(e) and [3](g) of the [Defending Women EO]."  (ER-104–105.)

The district court granted plaintiffs a temporary restraining order on February 14, 2025 (ER-107–108); and, on February 28, 2025, the district court issued a preliminary injunction (ER-58).  In issuing the preliminary injunction, the district court first held that plaintiffs, with one exception, had standing to assert the claims described above.[2]  (ER-12–24.)  And, without directly addressing defendants' argument that plaintiffs' claims were unripe, the court further held that plaintiffs' claims were reviewable as *ultra vires* equitable causes of action, given

---

[1] The complaint also asserted that Section 8(a) of the Protecting Children EO violates the Tenth Amendment and separation of powers (ER-102–103), but the district court held that plaintiffs lack standing to challenge that provision (ER-8).  The complaint also asserted that the Executive Orders violate the Fifth Amendment's due process protections against impermissibly vague laws, but the district court did not address that claim in issuing the preliminary injunction.  (ER-51.)

[2] The district court held that the State of Minnesota lacked standing to challenge Section 4 of the Protecting Children EO.  (ER-13.)

9

that plaintiffs had not pleaded any statutory cause of action under the Administrative Procedure Act or otherwise.  (ER-24–25.)

Turning to the merits, the district court held that plaintiffs were likely to succeed on their facial, *ultra vires* claims that the challenged portions of the Executive Orders violate the Constitution's separation of powers by "usurp[ing] Congress's spending, appropriation, and legislative powers" (ER-25–28) and that they violate the Fifth Amendment's equal protection component by discriminating based on sex and "transgender status" (ER-28–51).  The court further held that plaintiffs would suffer irreparable harm absent an injunction (ER-53) and that the balance of the equities and the public interest favored an injunction (ER-54).

As to the scope of the injunction, the district court rejected the government's position that any injunction should be limited to the named plaintiffs that had established standing and should not extend to any nonparty healthcare providers geographically situated within the state plaintiffs' boundaries.  (ER-54–57.)  The court determined instead that "statewide relief" was "essential to provide complete relief to Plaintiffs" because, in declarations submitted to the court, "dozens of

10

[healthcare] providers attest[ed] to the widespread harms the
[Executive] Orders have inflicted on providers in the Plaintiff States,
including state institutions, nonprofit entities, and private
practitioners." (ER-56.) The court also said that "anything less than a
statewide injunction would risk impacting some members of patients'
care teams, but not others," "leading to an overly complex enforcement
landscape within Plaintiff States and undermining the injunction's
impact on transgender youth seeking care." (ER-56.)

Accordingly, the district court entered a preliminary injunction
enjoining defendants "from enforcing or implementing Section 4 of [the
Protecting Children EO] within the Plaintiff States" and "from
enforcing Sections 3(e) or 3(g) of [the Defending Women EO] to
condition or withhold federal funding based on the fact that a health
care entity or health professional provides gender-affirming care within
the Plaintiff States." (ER-58.)

## SUMMARY OF ARGUMENT

Plaintiffs here do not challenge any concrete action that any
agency has taken pursuant to the Executive Orders. They have instead
brought a facial, *ultra vires* challenge, which requires them to show that

11

*no* agency could take *any* hypothetical action to carry out the policies of the Executive Orders that is even plausibly within its statutory and constitutional authority. Plaintiffs cannot meet that near-insurmountable burden. Congress may impose limits on how federal funds are spent, but within those limits, federal agencies often have discretion to determine priorities or take other discretionary steps with respect to funding, and the President, as the head of the Executive Branch, may direct federal agencies to exercise that discretion in a particular way. The Executive Orders here direct federal agencies to exercise whatever discretion they have under existing law to avoid funding "gender ideology" or "gender affirming care," and there are multiple circumstances in which an agency may reasonably do so. The district court misapplied the standard for facial challenges in concluding that the Executive Orders had to affirmatively identify statutory authorization for their policies, rather than recognizing that plaintiffs bear the burden of demonstrating that no plausibly lawful applications of the Executive Orders exist. Plaintiffs fail to meet that burden in no small part because their suit is premised on hypothetical

12

actions agencies might take based on as-yet-unidentified statutory authorities.

The same problems doom plaintiffs' equal protection claim, which is likewise premised on hypothetical actions agencies have not identified, much less taken. Those points alone are sufficient basis to reverse. But even if it were necessary to consider plaintiffs' equal protection claim on its merits, it fails because the Executive Orders do not classify based on sex or transgender status. The Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), forecloses plaintiffs' equal protection claim. Like the Tennessee law that prohibited sex transition interventions on minors in *Skrmetti*, the Executive Orders at most merely classify based on age and medical use and are, therefore, subject only to rational basis review, which they easily satisfy under *Skrmetti*. The Executive Orders would also satisfy heightened scrutiny, were it applicable. Therefore, the Executive Orders do not violate the Constitution's equal protection guarantee.

The district court also misapplied the remaining preliminary injunction factors. The injunction improperly intrudes on the President's authority to instruct subordinate officials to carry out policy

13

and undermines the implementation of policies that respond to the reasonable concerns about identified medical interventions for children that the Supreme Court recognized in *Skrmetti*.

Finally, even if a preliminary injunction were appropriate, the Supreme Court's decision in *Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631 (U.S. June 27, 2025), makes clear that the district court's multi-statewide preliminary injunction is overbroad. *CASA* explains that a federal court's power is limited to "administer[ing] complete relief *between the parties*," *id.* at *11, and expressly rejects the rationales the district court advanced for statewide relief. Any injunction must be limited to providing relief only to the named plaintiffs who have established Article III standing.

## STANDARD OF REVIEW

"A district court's decision to grant a preliminary injunction is generally reviewed for an abuse of discretion." *Gorbach v. Reno*, 219 F.3d 1087, 1091 (9th Cir. 2000) (en banc). The scope of an injunction is also reviewed for abuse of discretion. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 876 (9th Cir. 2009). But the district court "necessarily abuses its discretion when it bases its

14

decision on an erroneous legal standard or on clearly erroneous findings of fact." *Harris v. Board of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 760 (9th Cir. 2004).

The district court's errors in granting the preliminary injunction here are errors of law subject to de novo review, and the overbroad scope of the injunction likewise rested on legal errors that are reviewed de novo.

## ARGUMENT

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To be entitled to a preliminary injunction, plaintiffs had to clearly show "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. The district court abused its discretion in ruling that plaintiffs met this high standard, and its preliminary injunction should be vacated.

15

## I.    Plaintiffs Have No Likelihood of Success on the Merits of the Sweeping Facial Claims They Asserted

Plaintiffs failed to demonstrate that they are likely to succeed on the merits of their claims.  In ruling otherwise, the district court misinterpreted the terms and legal effect of the Defending Women EO and the Protecting Children EO and misunderstood the threshold requirements for plaintiffs' claims.

Congress may pass, and the President may sign, Acts imposing limits on how federal funds may be spent.  But while respecting those limits, federal agencies may often exercise their discretion to determine where funds go.  And the President, as the head of the Executive Branch, may direct federal agencies to exercise that discretion in a particular way.

That is all the Executive Orders here do.  They direct federal agencies to exercise what discretion they have under existing law to avoid funding "gender ideology" or "gender affirming care."  Because the Executive Orders merely tell agencies how to exercise their discretion within the limits established by law—and do not themselves terminate any funding—plaintiffs' facial challenge to the President's authority to issue the Executive Orders is meritless.  Plaintiffs' equal protection

16

claim fails too, because the Executive Orders do not classify based on sex or transgender status, and they easily satisfy rational basis review; and even if they did classify on either of these bases, they would survive heightened scrutiny.

### A.    The President acted within his authority in issuing the Executive Orders

Plaintiffs here do not challenge any action actually taken by an agency pursuant to the Executive Orders.  They instead have brought a freestanding suit depending on the premise that the Executive Orders impose some immediate obligation on agencies to act unlawfully in managing federal grant programs.  That conclusion ignores the plain text of the Executive Orders, which direct the President's subordinates to take steps "as permitted by law," Defending Women EO § 3(e), or "consistent with applicable law," Protecting Children EO § 4.  The President may instruct subordinate officials on how to exercise any discretion they possess in carrying out their duties, and to the extent plaintiffs are actually harmed by some exercise of agency discretion, they would be free to challenge that action in the future.

The Supreme Court's recent grant of a stay in *Trump v. AFGE*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025), underscores the

point.  There, an executive order directed agencies to "undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law."  Exec. Order No. 14,210, § 3(c), 90 Fed. Reg. 9669, 9670 (Feb. 14, 2025).  The plaintiffs sued to challenge the order and an implementing memorandum from the Office of Personnel Management and Office of Management and Budget that directed agencies to submit RIF plans for review, asserting that the RIFs would be unlawful without congressional authorization.  The district court entered a preliminary injunction barring implementation of the order and memorandum, without reviewing any actual agency plan for a RIF.  The Supreme Court stayed the injunction, explaining that the government was "likely to succeed on its argument that the Executive Order and Memorandum are lawful" and emphasizing that the district court had "enjoined further implementation or approval of the plans based on its view about the illegality of the Executive Order and Memorandum, not on any assessment of the plans themselves."  *AFGE*, 2025 WL 1873449, at *1.  As Justice Sotomayor observed in her concurrence, "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,'" and because the "plans

18

themselves" were not before the Court, it had "no occasion to consider whether they can and will be carried out consistent with the constraints of law." *Id.*

Here, the district court's conclusion is especially inappropriate given the task plaintiffs set for themselves with this suit. Because there is no agency action at issue, plaintiffs cannot proceed under the Administrative Procedure Act, and plaintiffs identify no other statutory basis for judicial review. Nor can they obtain injunctive relief against the President's issuance of the Executive Orders. Instead, plaintiffs have brought a nonstatutory *ultra vires* action that seeks to enjoin actions agencies might take pursuant to the Executive Orders, and they have also framed that challenge as a "facial challenge" to the Executive Orders' constitutionality. (*See* ER-100–102.)

Plaintiffs' suit thus faces significant barriers. First, nonstatutory *ultra vires* suits are "strictly limited" and are not available "simply because an agency has arguably reached a conclusion which does not comport with the law," but instead may be invoked "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n*

19

*v. Texas*, 145 S. Ct. 1762, 1775–76 (2025); *see also Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766 (D.C. Cir. 2022) ("To be ruled ultra vires, the challenged action must contravene a clear and specific statutory mandate, and the statutory construction adopted by an agency will be held impermissible only if it is utterly unreasonable.") (cleaned up). Such nonstatutory review claims "rarely succeed[]," *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776, and are especially unlikely to do so here; because plaintiffs assert a facial challenge, they must demonstrate that "*no set of circumstances exists* under which the [Executive Orders] would be valid," *Reno v. Flores*, 507 U.S. 292, 301 (1993) (emphasis added).

Thus, to succeed here, plaintiffs must show that any hypothetical action an agency could possibly take in response to the challenged Executive Orders would contravene some specific statutory or constitutional prohibition—indeed, that any action taken pursuant to an interpretation of statutory grant authority conferred by Congress would be "utterly unreasonable." *Federal Express Corp.*, 39 F.4th at 766. Plaintiffs cannot meet that imposing standard, both given the plain text of the Executive Orders and the inherent uncertainty about

20

what actions agencies might take to implement them. Indeed, adjudicating plaintiffs' suit in this posture—where the entire focus of the action is on hypothetical actions plaintiffs believe agencies might take in the future under as-yet-unidentified statutory authorities—is inappropriate. *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (noting that a suit is not ripe for review if dependent on "future uncertainties").

> ### 1. The President properly exercises supervisory authority over the Executive Branch

The President issued the challenged Executive Orders as an exercise of his authority to supervise and direct the actions of his subordinates in the Executive Branch. The Constitution provides that the "executive power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, cl. 1, who "shall take care that the laws be faithfully executed," *id.* § 3. The President's constitutional authority under these provisions necessarily encompasses "general administrative control of those executing the laws," *Myers v. United States*, 272 U.S. 52, 164 (1926), throughout the Executive Branch. As the Supreme Court explained long ago:

21

> The ordinary duties of officers prescribed by statute come
> under the general administrative control of the President by
> virtue of the general grant to him of the executive power,
> and he may properly supervise and guide their construction
> of the statutes under which they act ….

*Id.* at 135; *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,

561 U.S. 477, 492 (2010) ("The landmark case of *Myers v. United States*

reaffirmed the principle that Article II confers on the President the

general administrative control of those executing the laws."); *Building

& Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002)

("[The President's] faithful execution of the laws enacted by the

Congress … ordinarily allows and frequently requires the President to

provide guidance and supervision to his subordinates."); *Proposed

Executive Order Entitled "Federal Regulation*," 5 Op. O.L.C. 59, 63

(1981) (concluding that the President may "require agencies to exercise

their discretion, within statutory limits," in accordance with the terms

of an executive order).

    That is precisely what the Defending Women EO and the

Protecting Children EO do.  Invoking the authority vested in the

President "by the Constitution and the laws of the United States of

America," the Executive Orders direct federal agencies to exercise what

22

discretion they have under existing law to avoid funding "gender ideology" or "gender affirming care." *See* Defending Women EO, pmbl., § 3(e), (g); Protecting Children EO, pmbl., § 4.

Specifically, the Defending Women EO directs agencies to "take all necessary steps, *as permitted by law*, to end the Federal funding of gender ideology," § 3(e) (emphasis added), and subsequently directs agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," § 3(g). Although § 3(g) does not expressly restate the qualifier that is explicit in § 3(e)—"as permitted by law"—the two provisions must be read together because they appear in the same section and address the same subject matter. *See United States v. Stewart*, 311 U.S. 60, 64 (1940) ("[A]ll acts *in pari materia* are to be taken together, as if they were one law."); *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022) ("'[S]tatutes addressing the same subject matter' generally should be interpreted consistently with each other." (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006))). And in any event, the Defending Women EO as a whole is to be "implemented consistent with applicable law." § 8(b). Accordingly, the relevant provisions of the

23

Defending Women EO direct agencies to exercise their discretion only to the extent permitted by law to end the federal funding of gender ideology.

The Protecting Children EO similarly directs that agencies "shall, *consistent with applicable law* …, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children"—which has been called "gender affirming care." Protecting Children EO § 4 (emphasis added). And that executive order, too, directs in closing that it "shall be implemented consistent with applicable law." § 11(b).

Therefore, the plain language of the Executive Orders directs agencies to avoid funding "gender ideology" and "gender affirming care" within the limits established by existing applicable law. Consequently, if an executive agency, such as the Department of Health and Human Services (HHS), may lawfully implement the Executive Orders, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Orders, then the Executive Orders themselves instruct the agency to follow the law. *See Allbaugh*, 295 F.3d at 33. "The mere possibility that some agency might make a

24

legally suspect decision to … deny funding" based on the Executive

Orders "does not justify an injunction." *Id.*

None of this offends the separation of powers. Congress may

confer discretion on the Executive Branch over funding in a variety of

ways that could affect the ability to implement the Executive Orders

here. Congress may create grant programs that leave discretion to the

Executive Branch in their implementation and selection of worthy

projects to fund, and "the allocation of grant funds among various

eligible recipients, none of which has any statutory entitlement to them,

is traditionally a matter 'committed to agency discretion by law.'"

*California Hum. Dev. Corp. v. Brock*, 762 F.2d 1044, 1052 (D.C. Cir.

1985) (Scalia, J., concurring); *see Morton v. Ruiz*, 415 U.S. 199, 230

(1974) (recognizing an agency's "power to create reasonable

classifications and eligibility requirements in order to allocate the

limited funds available to [it]"). Similarly, the Supreme Court has held

that "[t]he allocation of funds from a lump-sum appropriation is [an]

administrative decision traditionally regarded as committed to agency

discretion" by law. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "After

all," the Court explained, "the very point of a lump-sum appropriation is

25

to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* That may well include, in appropriate cases, allocating funds based on priorities set forth in Executive Orders.

In addition, while Congress may directly "attach conditions on the receipt of federal funds," it may equally delegate that power to the Executive Branch, conditioning receipt of funds "upon compliance by the recipient with federal . . . administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

One example is illustrative. The Public Health Service Act, 42 U.S.C. § 241 *et seq.*, confers broad authority on the Secretary of Health and Human Services to fund research and to award research grants for various purposes. *See, e.g.*, 42 U.S.C. § 241(a), (a)(3), (b)(1), (b)(3), (c); *id.* § 247b; *id.* § 284(b)(2); *id.* §§ 300u-1, 300u-2, 300u-3. These include grants to universities, hospitals, laboratories, and other public or private institutions for research projects relating to human physical and mental diseases. *Id.* §§ 241(a), (a)(3), 284(b)(2). The Secretary may also make grants to States and other public entities to assist them with the costs of establishing and maintaining preventive health service

26

programs, *id.* § 247b(a), and to States and other public and nonprofit private entities for research, public education, and training of healthcare professionals in the prevention and control of diseases, *id.* § 247b(k).

While these programs are subject to some restrictions from Congress—such as that projects funded under § 241(a)(3) must be "recommended by the advisory council"—none of these statutory authorities contains any affirmative requirement that grants be used to support "gender affirming care" or "gender ideology." Consequently, an agency's implementation of the Executive Orders' directives to avoid funding these particular activities would not conflict with these statutory grant authorizations. And more generally, HHS regulations have long recognized that grant terms may "include statutory, *executive order*, other Presidential directive, or regulatory requirements that apply by specific reference and are not program-specific." 45 C.F.R. § 75.210(b)(1)(ii) (emphasis added); *see also id.* § 75.300(a); *Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) (upholding agency's funding policies based on executive order and within congressional limits).

27

As these points illustrate, there are multiple circumstances in which an agency may reasonably implement the Executive Orders: in choosing between multiple applicants for a limited pool of funds, when Congress makes a lump-sum appropriation to an agency, or when Congress authorizes agencies to impose conditions on grants, agencies may act consistent with the Executive Orders and the relevant statutes. Plaintiffs thus cannot plausibly claim that *every* conceivable action that might be taken under one or more of these authorities would be "entirely in excess of [the agency's] delegated powers and contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776. Much less can they claim to have shown that every conceivable action that could be taken under every grant program would be not only contrary to a specific prohibition but so obviously so as to be *ultra vires*.

### 2. The district court misconstrued the Executive Orders

As noted above, plaintiffs have not challenged any concrete action by any agency taken pursuant to the Executive Orders.[3] It is thus

---

[3] The district court pointed out that, after the Executive Orders were issued, two agency components issued notices (which have since been rescinded) to grant recipients stating that grant funds may not be used for activities that do not align with the Executive Orders. (ER-15–

*Continued on next page.*

unclear what actions agencies will take, as well as what statutory authorities might be relevant to those hypothetical future actions. Indeed, the district court itself acknowledged "[t]he fact that the loss of funds has not yet materialized" and that "enforcement of the [Executive] Orders has not yet occurred." (ER-14.)  Whether viewed as a ripeness issue because plaintiffs' challenge is dependent on contingent future events, *see Scoggins*, 718 F.3d at 270, or as a failure to meet their burden to show that there is no action any agency could possibly take pursuant to the Executive Orders that would not be *ultra vires*, *see Nuclear Regul. Comm'n*, 145 S. Ct. at 1776; *Reno*, 507 U.S. at 301, plaintiffs' challenge cannot succeed at this stage.

The district court tried to solve this problem by misreading the Executive Orders and inverting the relevant analysis for plaintiffs' facial *ultra vires* claim.  Rather than requiring plaintiffs to demonstrate that there is *no* hypothetical action that *any* agency could take that would not manifestly contravene a clear statutory or constitutional

---

16.)  The Centers for Disease Control and Prevention also temporarily terminated several grants that it reinstated less than two weeks later. (ER-3–4.)  Plaintiffs, however, have not asserted any claims challenging these actions.

29

prohibition, *see Nuclear Regul. Comm'n*, 145 S. Ct. at 1776, the court believed an injunction was warranted based on its counterfactual conclusion that the *government* had not identified legislation that affords discretion for agency action consistent with the Executive Orders. (ER-27.) But that gets matters exactly backwards: it is plaintiffs' burden to show that their facial *ultra vires* challenge succeeds, not the government's burden to prove the negative as to actions no agency has yet taken under as-yet-unidentified statutory authorities.

Indeed, the district court faulted the Executive Orders for not identifying every statutory authority supporting their implementation. (ER-27.) But that only underscores that a significant point of the Executive Orders was to direct agencies to determine how to carry out the Executive Orders consistent with law—in other words, to ascertain which authorities agencies might invoke to lawfully implement the Orders. That the Orders themselves did not cite every statutory authority or delegation is thus unsurprising, and it would have been impractical in any event given the large number of agencies at which the Orders were directed and the many different federal funding

30

statutes applicable to them, differing with each agency. Instead, the Executive Orders invoked the President's Article II authority to supervise the Executive Branch and "the laws of the United States of America," Defending Women EO, pmbl., § 3(e), (g); Protecting Children EO, pmbl., § 4, and no more is required for a presidential directive to agencies to take steps to reflect administration policy consistent with law.

The district court apparently found convincing plaintiffs' "evidence that none of the funds received by medical institutions in the Plaintiff States have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care." (ER-27.) But even if that were true, it falls far short of satisfying plaintiffs' heavy burden to show the Executive Orders are without any lawful application. For one thing, the universe of federal funds is not limited to those received by medical institutions in the plaintiff states. Furthermore—and importantly—the mere absence of a statute that *affirmatively* requires medical institutions to *refrain* from providing gender-affirming care does not speak at all to the relevant question—*i.e.*, whether agencies have discretion to implement the Executive Orders within the limits

31

Congress *has* established. As we demonstrated *supra* pp. 25–28, agencies do have discretion to implement the Executive Orders under various circumstances.

The district court's assumptions about unlawful action also required ignoring the plain language of the Executive Orders. According to the district court, the Executive Orders "impose[d] a condition on the receipt of federal funds" that was "effective immediately." (ER-25.) But that is not what the Executive Orders say. To be sure, the Protecting Children EO directs agencies to act "immediately," but not to cut off funds. Rather, what agencies must do "immediately" is to "take *appropriate steps* to ensure" that funds do not go to certain activities, Protecting Children EO § 4 (emphasis added)— with "appropriate" defined in reference to the "applicable law" emphasized earlier in the same sentence, *id*. The Defending Women EO similarly directs agencies to "take all necessary steps, as permitted by law, to end" the federal funding of gender ideology. § 3(e). Thus, the Executive Orders are not self-executing and do not themselves terminate or condition any grant, but rather task agencies with determining in the first instance the extent to which their statutory

32

grant authorities allow the imposition of conditions or prioritization of funded activities consistent with the policies in the Executive Orders. Because the Orders are not self-executing, but instead require agencies to follow applicable law in implementing them, the district court's concern that the Executive Orders may "surprise states with post acceptance conditions" (ER-27) on federal grants is both speculative and unfounded.

The district court believed that the clear instruction in each Executive Order to follow applicable laws should be disregarded. (ER-51–52.) That reasoning erroneously gives no effect to important terms of the Executive Orders that direct agencies to follow the statutory law applicable to them. The interpretation of an executive order necessarily begins with its text, and the basic interpretive maxim that courts "ordinarily aim to give effect to every clause and word of a statute," *Polselli v. IRS*, 598 U.S. 432, 441 (2023), applies here.

The district court founded its disregard for the text on this Court's decision in *City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018). But *San Francisco* does not support the district court's conclusions. In *San Francisco*, this Court addressed an executive order

33

that directed the Attorney General and Secretary of Homeland Security
to "ensure that jurisdictions that willfully refuse to comply with 8
U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal
grants, except as deemed necessary for law enforcement purposes by
the Attorney General or the Secretary," "in their discretion and to the
extent consistent with law." *Id.* at 1232–33. This Court read that
executive order as directing that noncompliant jurisdictions be denied
*all* federal grant dollars, regardless of their connection to immigration
matters or statutory authorities, based on several textual conclusions.
The Court emphasized that the order directed the Office of
Management and Budget to compile "information on all Federal grant
money that currently is received by any sanctuary jurisdiction," and
that the order contained an exception only for "grants 'deemed
necessary for law enforcement purposes,'" and so the order was best
read to "direct[] the Attorney General and the Secretary to cut all other
grant programs," *id.* at 1239, particularly because conditions had
already been imposed on grants within the Attorney General's purview
before the executive order was issued, *id.* at 1238 & n.6. Given these
textual indications, the Court believed that the instruction to

34

implement the order "consistent with law" was inconsistent with the rest of the order.

Whatever the validity of that reasoning in the specific context of *San Francisco*, *see* 897 F.3d at 1247–50 (Fernandez, J., dissenting), it bears little resemblance to the Executive Orders here. The potentially affected programs are narrower in focus and tied to the specific concerns at issue. The Protecting Children EO addresses specific types of grants—"research or education grants to medical institutions"—and directs only that agencies that issue such grants take steps "consistent with applicable law and in coordination with the Director of the Office of Management and Budget." § 4. Similarly, the Defending Women EO directs agencies to end funding for gender ideology in their grant programs—again, as "permitted by law." § 3(e). Nor is it the case that the affected agencies had already, before the Executive Orders, placed similar conditions on grants or taken similar actions, leaving only grant programs for which it might be inferred no authority exists. And there is no exception in the Executive Orders that could give rise to an inference inconsistent with the Orders' instruction to take steps consistent with law.

35

Here, too, the Supreme Court's recent stay in *AFGE* is instructive: although both the district court in entering the injunction and this Court in denying a stay relied on *San Francisco* to conclude that the instruction to carry out the executive order "consistent with law" should be ignored, *see AFGE v. Trump*, 139 F.4th 1020, 1038 (9th Cir. 2025); *AFGE v. Trump*, No. 25-cv-03698, 2025 WL 1482511, at *23 (N.D. Cal. May 22, 2025), the Supreme Court concluded that the government was likely to succeed on the merits where the district court's injunction was premised on "its view about the illegality of the Executive Order and Memorandum, not on any assessment of the [agency] plans themselves," *AFGE*, 2025 WL 1873449, at *1; *see id.* (Sotomayor, J., concurring in the grant of stay).

In these circumstances, the Executive Orders' direction that agencies follow the law cannot be treated as merely "theoretical." Rather, as was the case in *Allbaugh*, 295 F.3d at 33, "if an executive agency … may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." Agencies should be afforded the

36

presumption that, in taking appropriate steps, they will act consistent with applicable law, including abiding by any governing statutory restrictions. And, of course, nothing precludes plaintiffs from suing over concrete instances of alleged noncompliance with statutory directives.

———————————————

At bottom, the district court's erroneous criticisms underscore both the premature nature of this suit and the fundamental unsuitability of a facial challenge. Plaintiffs' choice to litigate this question as a "facial challenge" to the Executive Orders' constitutionality "comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Id.* As is true in this case, "[c]laims of facial invalidity often rest on speculation about the law's coverage and its future enforcement. And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (citation and quotations omitted). The Supreme Court has "therefore made facial challenges hard to win." *Id.*

37

This case perfectly illustrates the point. The case depends entirely on "speculation" about the "coverage" and "future enforcement" of the Executive Orders, *NetChoice*, 603 U.S. at 723, including what grants might be affected, what statutory authorities might apply to action taken by an agency, and precisely what the relevant agency might require. Plaintiffs would, of course, be free to challenge some future action by an agency that they believe is inconsistent with the statutes governing that action. But this sort of blunderbuss challenge to hypothetical future actions cannot support a preliminary injunction.

## B.    The Executive Orders do not discriminate based on sex or transgender status

The same problems are inherent in plaintiffs' equal protection claim under the Fifth Amendment (ER-100–101), which likewise lodges a facial, *ultra vires* challenge to hypothetical future actions agencies might take and which cannot form the basis for an injunction for the same reasons explained above. But even if considered, plaintiffs' equal protection claim lacks merit because the Executive Orders do not discriminate based on sex or transgender status, and they easily survive rational basis review. Nor is transgender status a suspect class triggering heightened scrutiny to begin with; but if it were, and even

38

assuming that the Executive Orders classify based on either sex or transgender status, they would still survive heightened scrutiny.

The Due Process Clause of the Fifth Amendment "forbids the Federal Government to deny equal protection of the laws," *Davis v. Passman*, 442 U.S. 228, 234 (1979), and the Fourteenth Amendment prohibits the States from denying to any person within their jurisdiction "the equal protection of the laws," U.S. Const. amend. XIV, § 1. "[T]he equal protection obligations imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975).

Under the equal protection analysis, courts "apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Typically, a classification in the law need only be "rationally related to a legitimate governmental purpose." *Id.* "Classifications based on race or national origin," on the other hand, are suspect and receive "the most exacting scrutiny." *Id.* And "[b]etween these extremes of rational basis review and strict scrutiny lies a level of

39

intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*

The district court here applied intermediate (or heightened) scrutiny based on its determination that "the Executive Orders facially discriminate on the basis of transgender status and sex." (ER-34.) But the Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), makes clear that the Executive Orders here—which focus on specific forms of medical interventions for children age 19 and under—are reviewed under, and survive, rational basis review.

### 1. The Supreme Court in *Skrmetti* upheld a state law prohibiting the same interventions at issue here for minors

In *Skrmetti*, the Supreme Court held that Tennessee's child-protection law proscribing sex transition interventions for minors, including the use of puberty blockers, cross-sex hormones, and surgery to address gender dysphoria, was not subject to heightened scrutiny because it did not classify based on sex or "transgender status." 145 S. Ct. 1816. In particular, the Tennessee law prohibited a healthcare provider from "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being," or "[p]rescribing,

40

administering, or dispensing any puberty blocker or hormone" for the purpose of (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." *Id.* at 1826. The Tennessee law was limited, however, in that it did not restrict the administration of puberty blockers or hormones to individuals 18 and over. And it did not fully ban the administration of such drugs to minors: a healthcare provider could administer puberty blockers or hormones to treat a minor's congenital defect, precocious puberty, disease, or physical injury. The Tennessee law expressly excluded the following from the definitions of "congenital defect" and "disease": "gender dysphoria, gender identity disorder, [and] gender incongruence." *Id.* at 1826–27.

The Supreme Court held that the Tennessee law was not subject to heightened review because it merely classified "on the basis of age" and "on the basis of medical use," and "[c]lassifications that turn on age or medical use are subject to only rational basis review." *Skrmetti*, 145 S. Ct. at 1829. The Court explained that the law classified on the basis of age because "[h]ealthcare providers may administer certain medical

41

treatments to individuals ages 18 and older but not to minors." *Id.* And it also classified on the basis of medical use because "[h]ealthcare providers may administer puberty blockers or hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence." *Id.*

The Court rejected the plaintiffs' contention that the Tennessee law "relies on sex-based classifications," noting that "[n]either of the above classifications"—based on age or medical use—"turns on sex." *Skrmetti*, 145 S. Ct. at 1829. Rather, the Court explained, the law "prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex." *Id.* The mere fact that the law used "sex-based language" in proscribing certain medical treatments did not "sweep [the law] within the reach of heightened scrutiny," the Court said, especially not in the medical context where certain treatments and procedures "are uniquely bound up in sex." *Id.* at 1829–30. And, because the law's classifications were "neither covertly nor overtly based on sex," the plaintiffs' argument that the law evinced "sex-based stereotyping" was "misplaced." *Id.* at 1832.

42

The Court also rejected the argument that the Tennessee law's application turns on sex by "prohibit[ing] certain treatments for minors of one sex while allowing those same treatments for minors of the opposite sex." *Skrmetti*, 145 S. Ct. at 1830. That argument "contort[s] the meaning of the term 'medical treatment'" by omitting "the underlying medical concern the treatment is intended to address"— under the Tennessee law, "*no* minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence," and "minors of *any* sex may be administered puberty blockers or hormones for other purposes." *Id.* at 1830–31.

The Court further held that the Tennessee law likewise did not discriminate against trans-identifying individuals or classify on the basis of transgender status, without deciding whether trans-identifying individuals are a suspect class to begin with. *Skrmetti*, 145 S. Ct. at 1832–33. Specifically, the Court concluded that the Tennessee law's prohibition on medical interventions for gender dysphoria, gender identity disorder, and gender incongruence did not discriminate against trans-identifying individuals because "there is a 'lack of identity'

43

between transgender status and the excluded medical diagnoses," given that some but not all trans-identifying individuals might seek the excluded interventions. *Id.* at 1833.

The Court thus applied rational basis review. And, finding that the Tennessee law "clearly" met that standard, the Court held that it did not violate the equal protection guarantee of the Fourteenth Amendment. *Skrmetti*, 145 S. Ct. at 1835–37.

## 2. The Executive Orders are materially indistinguishable from the Tennessee law upheld in *Skrmetti*

Like the Tennessee law at issue in *Skrmetti*, the Protecting Children EO classifies based on age and medical use. The Order addresses specified sex transition interventions—the use of puberty blockers, cross-sex hormones, and certain surgical procedures[4]—for

---

[4] To be precise, the specified interventions identified in the Protecting Children EO are (1) "the use of puberty blockers … to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; (2) "the use of sex hormones … to align an individual's physical appearance with an identity that differs from his or her sex"; and (3) "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." § 2(c).

44

children under age 19, but not for older individuals. §§ 2(a), (c), 4.
These classifications, which "turn on age or medical use[,] are subject to
only rational basis review." *Skrmetti*, 145 S. Ct. at 1829.

As in *Skrmetti*, neither of the above classifications turns on sex or
transgender status. Rather, the Protecting Children EO singles out the
use of puberty blockers, cross-sex hormones, and surgeries for certain
*medical uses* or purposes, regardless of the individual's sex or
transgender status. *See Skrmetti*, 145 S. Ct. at 1829, 1832–33. The fact
that only trans-identifying individuals may seek the referenced
interventions for those purposes does not change this conclusion. *Id.* at
1833 (finding no discrimination based on transgender status even
though "only transgender individuals seek treatment for" the excluded
diagnoses). Nor does the fact that the Protecting Children EO uses
"sex-based language" to describe the interventions mean that it
classifies based on sex. "[The Supreme] Court has never suggested that
mere reference to sex is sufficient to trigger heightened scrutiny. Such
an approach, moreover, would be especially inappropriate in the
medical context" because "[s]ome medical treatments and procedures
are uniquely bound up in sex." *Id.* at 1829 (citation omitted).

The district court's contrary conclusion began with an implausible interpretation of the Protecting Children EO. The court viewed Section 4 as not allowing federally funded institutions to offer puberty blockers to a trans-identifying individual who needs them for cancer treatment or for other diseases *unrelated* to providing "gender affirming care," while allowing them to offer puberty blockers for such unrelated treatments to children who do not identify as transgender. Based on this interpretation, the court concluded that the Protecting Children EO discriminates based on "transgender status." (ER-34–35.)

But the district court's conclusion that treatments that are unrelated to "gender affirming care" are covered by the Protecting Children EO is implausible. "[T]he interpretation of an Executive Order begins with its text, which must be construed consistently with the Order's object and policy." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018). Here, the Protecting Children EO expressly describes the interventions it addresses as "gender affirming care." § 2. And the purpose of the Protecting Children EO is to prevent medical professionals from "maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults

46

can change a child's sex through a series of irreversible medical interventions." § 1. The Executive Order thus articulates a policy that the United States "will not fund … the so-called 'transition' of a child from one sex to another." *Id.* Therefore, it is clear based on the Protecting Children EO's text and its object and policy, *San Francisco*, 897 F.3d at 1238, that it addresses only sex transition interventions for children, which are sometimes referred to as "gender affirming care," *see* Protecting Children EO § 2. The Protecting Children EO does not address, and has no application to, unrelated treatments for cancer or other diseases, irrespective of whether the child in need of such treatments identifies as transgender.

The district court also thought the Protecting Children EO discriminates based on transgender status because it covers a trans-identifying child's use of hormones or surgery to align the child's physical appearance with an identity that differs from his or her sex, whereas a child who is not trans-identifying can receive hormones or surgery for a different medical purpose—"e.g., a mastectomy for a cisgender boy with gynecomastia, testosterone therapy for a cisgender male who wants to 'jumpstart' puberty, breast augmentation surgery

47

for a cisgender female." (ER-35.) But the Supreme Court rejected this same reasoning in *Skrmetti* because it "contort[s] the meaning of the term 'medical treatment'" by ignoring "the underlying medical concern the treatment is intended to address." 145 S. Ct. at 1830. The use of hormones to align a person's physical appearance with an identity that differs from his or her sex—*i.e.*, a "sex transition" intervention—is not the same medical treatment as the use of hormones to treat, for example, a congenital defect or other disease. *Id.* at 1830–31. The Protecting Children EO's coverage of the former but not the latter does not turn on sex or transgender status; rather, it is based on medical use. *Id.* at 1831.

Nor does the Protecting Children EO's policy on sex transition interventions rest on sex stereotypes, as the district court believed. (ER-36.) Again, *Skrmetti* rejected this same argument in circumstances that are materially indistinguishable. 145 S. Ct. at 1832. As in *Skrmetti*, the Protecting Children EO's age-based and medical-use classifications are "neither covertly nor overtly based on sex," *id.*; therefore, the district court's conclusion that the Executive Order evinces sex-based stereotyping is "misplaced" in the absence of a

48

showing that it "was motivated by an invidious discriminatory purpose," *id.*, and the district court made no such finding here, nor can plaintiffs even come close to such a showing.  The Protecting Children EO is motivated by the same concerns with sex transition interventions for children that supported the Tennessee law in *Skrmetti*, including protecting vulnerable children from interventions that "are experimental, can lead to later regret, and are associated with harmful—and sometimes irreversible—risks."  *Id.  Compare id.*, *with* Protecting Children EO § 1 ("Policy and Purpose").  Therefore, the Protecting Children EO's purpose to protect the health and welfare of all children, regardless of sex or transgender status, does not evince sex stereotyping.  *Skrmetti*, 145 S. Ct. at 1832 ("'A concern about potentially irreversible medical procedures for a child is not a form of stereotyping.'") (quoting *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 485 (6th Cir. 2023)).[5]

------

[5] The district court's faulty analysis about sex stereotyping rested on the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc).  (ER-36–37.)  But the Supreme Court has since vacated that judgment and remanded the case "for further consideration in light of *United States v. Skrmetti*, 605 U.S. __ (2025)." *Folwell v. Kadel*, No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025); *Crouch v. Anderson*, No. 24-90, 2025 WL 1787678 (U.S. June 30, 2025).

The Defending Women EO likewise makes no classification of persons based on sex or transgender status; indeed, Sections 3(e) and 3(g) of the Defending Women EO do not draw lines based on anyone's status.  The district court nevertheless concluded that the Defending Women EO "conditions grant funding *based on* whether grant recipients offer—among other things—gender-affirming services for individuals with gender dysphoria."  (ER-35.)  In other words, the district court viewed Sections 3(e) and 3(g) of the Defending Women EO as doing the same thing that Section 4 of the Protecting Children EO does by conditioning funding based on whether an institution provides "gender affirming care."  But insofar as the district court understood the two Executive Orders to be identical in this respect, there is no basis for subjecting the Defending Women EO to a different level of scrutiny or reaching any different result.

Finally, although this Court need not reach the issue in light of *Skrmetti*, trans-identifying individuals are not a suspect class that triggers heightened scrutiny to begin with.  Although we recognize this Court has held otherwise, *see Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024) (holding that heightened scrutiny applies to laws that

50

classify based on transgender status), *cert. granted*, No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025), the Supreme Court has never held that trans-identifying individuals are a suspect class, *Skrmetti*, 145 S. Ct. at 1832.[6]  Trans-identifying individuals do not exhibit "obvious, immutable, or distinguishing characteristics" that define them as "a discrete group"; have not, "as a historical matter, … been subjected to discrimination"; and are not a "politically powerless" group, *id.* at 1851–55 (Barrett, J., concurring); *accord id.* at 1860–67 (Alito, J., concurring in part and concurring in the judgment); *see also Skrmetti*, 83 F.4th at 486–87.  Defendants respectfully maintain that this Court's ruling in *Hecox* and in other cases that trans-identifying individuals are a suspect class was incorrect and should be overruled.

---

[6] The Supreme Court may answer this question in *Little v. Hecox*, No. 24-38 (S. Ct.), for which, as noted, certiorari was granted on July 3, 2025.  *See* 2025 WL 1829165 (granting certiorari on the question "[w]hether laws that seek to protect women's and girls' sports by limiting participation to women and girls based on sex violate the Equal Protection Clause of the Fourteenth Amendment," Petition for a Writ of Certiorari at i, *Little v. Hecox*, No. 24-38 (U.S. July 11, 2024), 2024 WL 3445118, at *i).

### 3. *Skrmetti* confirms that the Executive Orders have a rational basis for their classifications

"The rational basis inquiry employs a relatively relaxed standard" under which a classification will be upheld "so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Skrmetti*, 145 S. Ct. at 1835. "Where there exist plausible reasons for the relevant government action, [the court's] inquiry is at an end." *Id*.

Here, the Protecting Children EO covers what are essentially the same sex transition interventions for children that the Tennessee law at issue in *Skrmetti* prohibited for minors. Like that law, the Protecting Children EO's classifications based on age and medical use easily satisfy the rational basis inquiry, *see Skrmetti*, 145 S. Ct. 1835–37, as does the Defending Women EO to the extent it does the same thing as the Protecting Children EO, which is how the district court interpreted it (ER-35).

In *Skrmetti*, the Supreme Court held that the Tennessee statute survived rational basis review because of concerns that treatments may have "irreversibl[e]" and long-term effects and that "minors lack the

52

maturity to fully understand and appreciate the life-altering consequences of such procedures and [may later] express[] regret for medical procedures that were performed on or administered to them for such purposes when they were minors."  145 S. Ct. at 1835–36; *see id.* at 1841–43 (Thomas, J., concurring) (citing studies about the risks associated with the use of puberty blockers, hormones, and surgery to address gender dysphoria).  The Court also observed current "medical and scientific uncertainty" about the risks and benefits associated with administering puberty blockers and hormones to address gender dysphoria, and it pointed out that there are "open questions regarding basic factual issues" on these matters.  145 S. Ct. at 1836, 1837 (majority opinion); *see id.* at 1837 (citing Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* 22 (Apr. 2024)).  That "ongoing debate" provided further justification for Tennessee's statute as responding to that "uncertainty," while also noting the potential for "less invasive approaches that are likely to result in better outcomes for the minor."  *Id.* at 1836.  As the Court concluded, "[t]he Equal Protection Clause does not resolve these

53

disagreements," which are instead left to "the people, their elected representatives, and the democratic process." *Id.* at 1837.

Those same considerations provide the "reasonably conceivable" basis to support the effectively identical Protecting Children EO required by rational basis review, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), which expressly echoes many of the same concerns about the long-term effects of sex transition interventions—such as "sterilization" or other "lifelong medical complications," and the potential risks of "regret" by this "vulnerable" population, Protecting Children EO § 1. Indeed, the Executive Orders here even more straightforwardly satisfy rational basis review: unlike the state law in *Skrmetti*, the Executive Orders do not purport to ban the identified sex transition interventions, but instead address only funding issues surrounding those interventions.

Because the Executive Orders' age-based and medical-use classifications are rationally related to their purpose in protecting the health and welfare of children, plaintiffs' equal protection challenge must fail.

54

But even if this Court were to conclude that heightened scrutiny applies, the Executive Orders would still survive that inquiry for the reasons explained above. The district court found that the means employed by the Protecting Children EO are not "substantially related" to its objective of protecting the health and welfare of children because the Order: (1) designates age 19 (instead of age 18) as the cutoff for sex transition interventions; (2) is not limited to "irreversible" sex transition interventions; and (3) fails to cover other risky medical treatments for children that are performed for purposes other than sex transitioning. (ER-38–41.) None of those reasons is persuasive. A perfect means-end fit is not required under intermediate scrutiny. *See Associated Gen. Contractors of Cal., Inc. v. City & Cnty. of San Fransisco*, 813 F.2d 922, 942 (9th Cir. 1987). So the fact that the Executive Order includes sex transition interventions for 19-year-olds (and not just 18 and under) and may include some interventions that are not irreversible does not amount to an equal protection violation. Nor does the fact that the Order is directed specifically at sex transition interventions and not at all risky medical procedures for children undermine its constitutionality. *Cf. Skrmetti*, 145 S. Ct. at 1836 ("It

55

may be true … that puberty blockers and hormones carry comparable risks for minors no matter the purposes for which they are administered.  But it may also be true … that those drugs carry greater risks when administered to address gender dysphoria, gender identity disorder, and gender incongruence.").

The district court went on to reiterate its view that the Protecting Children EO addresses treatments "even outside the realm of gender care."  (ER-41–43.)  But as we demonstrated above, *supra* pp. 46–47, it does no such thing; the district court's belief that the Order addresses treatments unrelated to "gender affirming care" is implausible.

The remainder of the district court's heightened scrutiny analysis is grounded in the "ongoing debate," *Skrmetti*, 145 S. Ct. at 1836, about the risks and benefits associated with sex transition interventions (ER-43–49).  The district court concluded that the Protecting Children EO's goal of protecting the health and welfare of children "rejects the prevailing medical consensus" about the benefits of sex transition interventions for children (ER-49).  But the court's conclusion as to the "prevailing medical consensus" simply cannot stand, following the Supreme Court's recognition in *Skrmetti* that there is substantial

56

"medical and scientific uncertainty" in this area and that "open questions regarding basic factual issues" remain. 145 S. Ct. at 1836, 1837; *see also id.* at 1841 (Thomas, J., concurring) (rejecting as "untenable" the claim that "'overwhelming evidence' supports the use of puberty blockers and cross-sex hormones for treating pediatric gender dysphoria, and that this view represents 'the overwhelming consensus of the medical community'").

Finally, the district court's conclusion that the Defending Women EO "is motivated by purposeful discrimination" is baseless. (ER-50.) The Defending Women EO does not "aim to erase" or "deny the very existence of" trans-identifying people. (*See* ER-50.) Rather, its purpose includes protecting the "dignity, safety, and well-being" of women in general, including protecting women's privacy in "intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." Defending Women EO § 1. And, to the extent it relates to the funding of gender ideology, which the district court interpreted to include "gender affirming care," the Defending Women EO serves the same important government interests as the Protecting Children EO, discussed above.

57

## II.  Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors

The remaining preliminary injunction factors—irreparable harm, the balance of equities, and the public interest—likewise favor the government.  *See Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) ("Each of [the] four [preliminary injunction] requirements must be satisfied.").

First, plaintiffs cannot show irreparable harm.  As demonstrated above, plaintiffs do not challenge any actual agency action taken pursuant to the Executive Orders, and the mere "prospect" than an agency might act unlawfully—notwithstanding the directives of the Orders themselves—does not qualify as irreparable harm.  Similarly, the district court's view that trans-identifying youth, none of whom are named plaintiffs in this law suit, will face "dire harms" from being "deprived of gender-affirming care" (ER-53) conflicts with the Supreme Court's recognition that there is at minimum "medical and scientific uncertainty" about the risks and benefits associated with "sex transition" interventions for minors, *Skrmetti*, 145 S. Ct. at 1836; *id.* at 1836–37; *see also id.* at 1840 (Thomas, J., concurring) ("[T]here is no medical consensus on how best to treat gender dysphoria in children."),

58

including concerns about irreversible consequences that children may come to regret as adults, *see id.* at 1841–43 (citing studies).

As for the remaining factors, allowing the injunction to stand undermines important interests of the government and the public, whose interests "merge" in this context, *Nken v. Holder*, 556 U.S. 418, 435 (2009), in protecting the health and welfare of children. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens," and the Supreme Court has accordingly "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982).

In addition, the district court's injunction improperly intrudes on the President's authority to direct his subordinates to take action to implement an administration's policy objectives, and that intrusion "into the workings of a coordinate branch of the Government" likewise inflicts irreparable harm on the government. *INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers); *see also Trump v. CASA, Inc.*, Nos.

59

24A884, 24A885, 24A886, 2025 WL 1773631, at *14 (U.S. June 27, 2025).

## III. At Minimum, the District Court's Multi-Statewide Injunction Is Overbroad

The district court here entered a "statewide" injunction covering all four plaintiff states and applying to the government's dealings with nonparties not before the court. (*See* ER-44–57.) The Supreme Court has subsequently made clear that the equitable authority of district courts is limited to "administer[ing] complete relief *between the parties*." *Trump v. CASA, Inc.*, No. 24A884, 24A885, 24A886, 2025 WL 1773631, at *11 (S. Ct. June 27, 2025). The injunction here fails to comport with this basic rule, and if it were to stand at all, it should be narrowed to apply only to grant recipients owned or operated by one of the plaintiff states and grant recipients where the plaintiff physicians provide services.

The rationale the district court adopted in granting multi-statewide relief cannot survive *CASA*. The district court believed statewide relief for all four plaintiff states was appropriate because "dozens of [healthcare] providers attest[ed] to the widespread harms the [Executive] Orders have inflicted on providers in the Plaintiff States,

60

including state institutions, nonprofit entities, and private practitioners." (ER-56.) But as *CASA* explained, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 2025 WL 1773631, at *11. Providing relief to nonparty healthcare providers throughout the plaintiff states "would not render [the party's] relief any more complete." *Id.*

The district court also said that statewide relief was necessary because "a multidisciplinary approach is frequently necessary to address patients' medical needs," so "anything less than a statewide injunction would risk impacting some members of patients' care teams, but not others," "leading to an overly complex enforcement landscape within Plaintiff States and undermining the injunction's impact on transgender youth seeking care." (ER-56.) But the desire to avoid "complex[ity]" does not expand a district court's power to enter injunctive relief, which remains bounded by the Article III injuries of the parties before the court. To the extent the court intended to remedy injuries to the medical provider plaintiffs' patients, then any relief must

61

be so tailored and extend at most to the relevant, current "members of patients' care teams"—such as specific providers of "surgical care" or "endocrinology medical providers"—for whom grant funding or continued practice might be affected.[7]  (ER-56.)  But, as *CASA* makes clear, there is no basis for extending the injunction to nonparties simply because plaintiffs are unwilling to identify who needs relief.  *See CASA*, 2025 WL 1773631, at *17 (Thomas, J., concurring) (noting that the Court rejected the "argument that a 'plaintiff-specific injunction' would be difficult to administer and would subject the associations' members to the burden of having 'to identify and disclose to the government' their membership").

Finally, even if plaintiffs could identify some lingering injury not fully remedied by party-specific relief, those lingering effects would not justify the sweeping remedy of a statewide injunction that applies to nonparties across four states.  *See CASA*, 2025 WL 1773631, at *12 (explaining that complete relief is a "maximum" and not a "guarantee").  Not only is the district court's injunction granting relief to nonparties

---

[7] The district court held that the plaintiff physicians had third-party standing to assert their patients' rights.  (ER-20.)

62

inconsistent with *CASA*, but it is also inconsistent with basic principles of equity, including that an enjoined defendant must know against whom it must refrain from acting. *See* Fed. R. Civ. P. 65(d).

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunction. In the absence of vacatur, the Court should limit the scope of the injunction to the named plaintiffs.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney*
   *General*

BRAD HINSHELWOOD

<u>*s/ Jacob Christensen*</u>
JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7525*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-5048*
   *jacob.christensen@usdoj.gov*

July 2025

63

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Jacob Christensen*

Jacob Christensen

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains <u>11,912</u> words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.


*s/ Jacob Christensen*
Jacob Christensen

**ADDENDUM**

## TABLE OF CONTENTS

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025) .................. A1

Exec. Order No. 14,187, 90 Fed. Reg. 8771 (Feb. 3, 2025) ................... A7

**Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government – Exec. Order No. 14,168,  90 Fed. Reg. 8615 (Jan. 30, 2025)**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

Section 1. Purpose. Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

Sec. 2. Policy and Definitions. It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all

A1

Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. *8616 Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

Sec. 3. Recognizing Women Are Biologically Distinct From Men.

(a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct

A2

sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in Bostock v. Clayton County (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in Bostock v. Clayton County (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in

A3

protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Sec. 4. Privacy in Intimate Spaces.

(a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act. *8617

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

Sec. 5. Protecting Rights. The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil

A4

Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

Sec. 6. Bill Text. Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

Sec. 7. Agency Implementation and Reporting.

(a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Nondiscriminatory School Environments for LGBTQI+ Students";

A5

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educaci¯oacute»n de EE.UU. Apoyar a los j¯oacute»venes y familias LGBTQI+ en la escuela" (June 21, 2023);

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021); *8618

(G) "Letter to Educators on Title IX's 49th Anniversary" (June 23, 2021);

(H) "Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families" (June 2021);

(I) "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County" (June 22, 2021);

(J) "Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students" (June 9, 2021); and

(K) "Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS" (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled "Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972"; and

(iv) the Equal Employment Opportunity Commission's "Enforcement Guidance on Harassment in the Workplace" (April 29, 2024).

Sec. 8. General Provisions.

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

A6

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE, January 20, 2025.


## Protecting Children from Chemical and Surgical Mutilation – Exec. Order No. 14,187, 90 Fed. Reg. 8771 (Feb. 3, 2025)

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Policy and Purpose. Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end.

Countless children soon regret that they have been mutilated and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child

A7

from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

Sec. 2. Definitions. For the purposes of this order:

(a) The term "child" or "children" means an individual or individuals under 19 years of age.

(b) The term "pediatric" means relating to the medical care of a child.

(c) The phrase "chemical and surgical mutilation" means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

Sec. 3. Ending Reliance on Junk Science.

(a) The blatant harm done to children by chemical and surgical mutilation cloaks itself in medical necessity, spurred by guidance from the World Professional Association for Transgender Health (WPATH), which lacks scientific integrity. In light of the scientific concerns with the WPATH guidance:

(i) agencies shall rescind or amend all policies that rely on WPATH guidance, including WPATH's "Standards of Care Version 8"; and

(ii) within 90 days of the date of this order, the Secretary of Health and Human Services (HHS) shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion.

A8

(b) The Secretary of HHS, as appropriate and consistent with applicable law, shall use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation. *8772

Sec. 4. Defunding Chemical and Surgical Mutilation. The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

Sec. 5. Additional Directives to the Secretary of HHS.

(a) The Secretary of HHS shall, consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents:

(i) Medicare or Medicaid conditions of participation or conditions for coverage;

(ii) clinical-abuse or inappropriate-use assessments relevant to State Medicaid programs;

(iii) mandatory drug use reviews;

(iv) section 1557 of the Patient Protection and Affordable Care Act;

(v) quality, safety, and oversight memoranda;

(vi) essential health benefits requirements; and

(vii) the Eleventh Revision of the International Classification of Diseases and other federally funded manuals, including the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

A9

(b) The Secretary of HHS shall promptly withdraw HHS's March 2, 2022, guidance document titled "HHS Notice and Guidance on Gender Affirming Care, Civil Rights and Patient Privacy" and, in consultation with the Attorney General, issue new guidance protecting whistleblowers who take action related to ensuring compliance with this order.

Sec. 6. TRICARE. The Department of Defense provides health insurance, through TRICARE, to nearly 2 million individuals under the age of 18. As appropriate and consistent with applicable law, the Secretary of Defense shall commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children.

Sec. 7. Requirements for Insurance Carriers. The Director of the Office of Personnel Management, as appropriate and consistent with applicable law, shall:

(a) include provisions in the Federal Employee Health Benefits (FEHB) and Postal Service Health Benefits (PSHB) programs call letter for the 2026 Plan Year specifying that eligible carriers, including the Foreign Service Benefit Plan, will exclude coverage for pediatric transgender surgeries or hormone treatments; and

(b) negotiate to obtain appropriate corresponding reductions in FEHB and PSHB premiums.

Sec. 8. Directives to the Department of Justice. The Attorney General shall:

(a) review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation;

(b) convene States' Attorneys General and other law enforcement officers to coordinate the enforcement of laws against female genital mutilation across all American States and Territories;

(c) prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation; *8773

A10

(d) in consultation with the Congress, work to draft, propose, and promote legislation to enact a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals practicing chemical and surgical mutilation, which should include a lengthy statute of limitations; and

(e) prioritize investigations and take appropriate action to end child-abusive practices by so-called sanctuary States that facilitate stripping custody from parents who support the healthy development of their own children, including by considering the application of the Parental Kidnaping Prevention Act and recognized constitutional rights.

Sec. 9. Enforcing Adequate Progress. Within 60 days of the date of this order, the heads of agencies with responsibilities under this order shall submit a single, combined report to the Assistant to the President for Domestic Policy, detailing progress in implementing this order and a timeline for future action. The Assistant to the President for Domestic Policy shall regularly convene the heads of agencies with responsibilities under this order (or their designees) to coordinate and prepare for this submission.

Sec. 10. Severability. If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of any of its other provisions to any other persons or circumstances shall not be affected thereby.

Sec. 11. General Provisions.

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

A11

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE, January 28, 2025.

A12