No. 25-1922

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Western District of Washington
No. 2:25-cv-00244-LK
The Honorable Lauren King

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

NICHOLAS W. BROWN
Attorney General of Washington

NOAH G. PURCELL, WSBA #43492
Solicitor General
WILLIAM MCGINTY, WSBA #41868
TERA HEINTZ, WSBA #54921
ANDREW R.W. HUGHES, WSBA #49515
CRISTINA SEPE, WSBA #53609
CYNTHIA ALEXANDER, WSBA #46019
NEAL LUNA, WSBA #34085
LUCY WOLF, WSBA #59028
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Noah.Purcell@atg.wa.gov
*Attorneys for State of Washington*

LAURYN K. FRAAS, WSBA #53238
COLLEEN MELODY, WSBA #42275
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Lauryn.Fraas@atg.wa.gov
Colleen.Melody@atg.wa.gov
*Attorneys for Physician Plaintiffs 1-3*

[Additional Counsel on Signature Page]

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................1

II.   STATEMENT OF THE ISSUE .........................................3

III.  STATEMENT OF THE CASE............................................4

     A.  Gender-Affirming Care Is Medically Necessary to Treat Gender Dysphoria and Overwhelmingly Supported by Evidence .........................4

     B.  Transgender Youth and Their Families Depend on Gender-Affirming Care ...............................................8

     C.  The Orders Unilaterally Defund Medical Institutions and Other Providers of Gender-Affirming Care ...................................10

     D.  The Orders Are Part of a Relentless Campaign Targeting Transgender People ............................................11

     E.  Plaintiffs Filed Suit and the District Court Granted Preliminary Relief ................................................13

IV.  SUMMARY OF ARGUMENT ........................................15

V.   STANDARD OF REVIEW ...............................................17

VI.  ARGUMENT ....................................................................17

     A.  The District Court Correctly Concluded Plaintiffs Are Likely to Succeed on the Merits ........................17

         1.  Unilaterally conditioning funding of medical institutions violates the separation of powers ...................................17

             a.  The Orders usurp Congress's spending and legislative authority.......................................18

             b.  Defendants' arguments conflict with precedent, the plain text of the Orders, and unchallenged factual findings of the district court ..........................................22

(1)     Generic savings clause language cannot override the
         Orders' explicit purpose and commands.............................22

(2)     Congress did not delegate authority to Defendants to
         set medical standards of care................................................26

(3)     Plaintiffs did not assert a facial ultra vires claim ..............30

(4)     The *AFGE* stay decision has no application here..............34

2.   The Orders Unlawfully Discriminate Against Transgender
     Youth.........................................................................................36

     a.   The Orders are subject to heightened scrutiny because they
          discriminate based on transgender status and sex .......................37

          (1)     The Orders discriminate based on transgender status
                   and sex ....................................................................................37

          (2)     *Skrmetti* does not alter this Court's precedent....................41

     b.   The Orders fail heightened scrutiny .............................................44

     c.   The Orders are rooted in animus ..................................................49

B.   The District Court Correctly Found that Plaintiffs Were Likely to
     Suffer Irreparable Harm if the Orders Are Not Enjoined .......................54

C.   The District Court Did Not Abuse Its Discretion in Concluding that
     the Balance of Equities Weighs in Plaintiffs' Favor, and that a
     Preliminary Injunction Is in the Public Interest .......................................56

D.   The District Court Did Not Abuse Its Discretion in Concluding that
     a Statewide Injunction Was Necessary to Provide the Plaintiffs
     Complete Relief..........................................................................................58

VII.  CONCLUSION................................................................................................63

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Inst. of Health*,
No. 25-CV-01620-LKG, 2025 WL 2377705 (D. Md. Aug. 14, 2025)......... 42, 43

*Am. Beverage Ass'n v. City and County of San Francisco*,
916 F.3d 749 (9th Cir. 2019) (en banc) ............................................... 17

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
No. 25-10787-WGY, 2025 WL 1822487 (D. Mass. July 2, 2025),
*granting stay in part*, 2025 WL 2415669 (U.S. Aug. 21, 2025) .......................... 28

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ...................................................... 32

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001) ...................................................... 51

*Biden v. Nebraska*,
600 U.S. 477 (2023) ...................................................... 27

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ...................................................... 36

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ...................................................... 53

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ...................................................... 30

*City and County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018).................. 2, 16, 17, 18, 19, 20, 22, 23, 25, 31, 32

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019)............................................... 27

*Clinton v. City of New York*,
524 U.S. 417 (1998) .................................................. 19, 22

*Dekker v. Weida,*
    679 F. Supp. 3d 1271 (N.D. Fla. 2023) .................................................52

*Dent v. West Virginia,*
    129 U.S. 114 (1889) .........................................................................27

*Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) ........................................................ 37, 49, 51

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) .........................................................................51

*Doe v. Horne,*
    115 F.4th 1083 (9th Cir. 2024).........................................................37

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
    92 F.3d 1486 (9th Cir. 1996)...........................................................60

*FCC v. Beach Commc'ns, Inc.,*
    508 U.S. 307 (1993) .........................................................................56

*Fed. Express v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ..........................................................33

*Fullilove v. Klutznick,*
    448 U.S. 448 (1980) .........................................................................19

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) .........................................................................28

*Greenwood v. FAA,*
    28 F.3d 971 (9th Cir. 1994)..............................................................26

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020)............................................................39

*Hecox v. Little,*
    104 F.4th 1061 (9th Cir. 2024)............................................. 37, 39, 48

*Hoye v. City of Oakland,*
    653 F.3d 835 (9th Cir. 2011).............................................................30

*In Re: Administrative Subpoena*,
   No. 1:25-mc-91324-MJJ (D. Mass. Sept. 9, 2025) ...............................................53

*Isaacson v. Horne*,
   716 F.3d 1213 (9th Cir. 2013) ..................................................................30

*June Med. Servs. LLC v. Russo*,
   591 U.S. 299 (2020) ...............................................................................62

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ............................................... 37, 39, 40

*Kinney-Coastal Oil Co. v. Kieffer*,
   277 U.S. 488 (1928) ...............................................................................59

*Lawrence v. Texas*,
   539 U.S. 558 (2003) ...............................................................................51

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ...............................................................................28

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ..................................................................56

*Morrison v. Olson*,
   487 U.S. 654 (1988) ...............................................................................26

*Nat'l Inst. of Health v. Am. Public Health Ass'n*,
   606 U.S. ---, No. 25A103, 2025 WL 2415669 (Aug. 21, 2025) ..........34

*New York v. Ferber*,
   458 U.S. 747 (1982) ...............................................................................57

*North Carolina v. Covington*,
   581 U.S. 486 (2017) ...............................................................................61

*Nuclear Regul. Comm'n v. Texas*,
   145 S. Ct. 1762 (2025) ...........................................................................33

*Orr v. Trump*,
   778 F. Supp. 3d 394 (D. Mass. 2025).................................... 50, 53, 54

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ...................................................................................27

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ........................................................... 40, 41

*PFLAG, Inc. v. Trump*,
    769 F. Supp. 3d 405 (D. Md. 2025) ...................................................51

*Poe v. Labrador*,
    709 F. Supp. 3d 1169 (D. Idaho 2023) ..............................................45

*Romer v. Evans*,
    517 U.S. 620, 634 (1996) ................................................... 3, 14, 49, 52

*Rush Prudential HMO, Inc. v. Moran*,
    536 U.S. 355 (2002) ............................................................................27

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) ....................................................................... 36, 44

*Sexuality & Gender All. v. Critchfield*,
    No. 1:23-CV-00315-DCN, 2025 WL 2256884 (D. Idaho Aug. 7, 2025)............42

*SmithKline Beecham Corp. v. Abbott Laboratories*,
    740 F.3d 471 (9th Cir. 2014)..............................................................44

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ............................................................................19

*Steele v. Bulova Watch Co.*,
    344 U.S. 280 (1952) ............................................................................59

*Talbott v. United States*,
    775 F. Supp. 3d 283 (D.D.C. 2025) ............................................. 52, 53

*Trump v. Am. Fed'n of Gov't Emps.* (*AFGE*),
    606 U.S. ---, No. 24A1174, 2025 WL 1873449 (July 8, 2025) ...........34

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ........................................................ 58, 59, 61

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ....................................................................59

*United States v. Bass*,
    404 U.S. 336 (1971) ....................................................................27

*United States v. Salerno*,
    481 U.S. 739 (1987) ....................................................................31

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025) ............................... 3, 4, 16, 39, 41, 42, 43, 44, 48, 55, 56

*United States v. Virginia (VMI)*,
    518 U.S. 515 (1996) ...................................................... 36, 37, 44, 49

*United States v. Windsor*,
    570 U.S. 744 (2013) ....................................................................37

*Washington v. Davis*,
    426 U.S. 229 (1976) ....................................................................36

*Washington v. Trump*,
    145 F.4th 1013 (9th Cir. 2025)................................................... 32, 58

*Whitman-Walker Clinic, Inc. v. Dep't of HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020) .........................................................62

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024).............................................................56

*Youngstown Sheet and Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................34

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1.........................................................19

U.S. Const. art. I, § 9, cl. 7.........................................................19

## Statutes

42 U.S.C. § 1395 ...................................................................................21

42 U.S.C. § 1396a(a)(23) ......................................................................21

42 U.S.C. § 18116 .................................................................................21

42 U.S.C. § 241 .....................................................................................26

42 U.S.C. § 283p ...................................................................................28

5 U.S.C. §§ 3501-3504 .........................................................................35

Tenn. Code Ann. § 68-33-101 ..............................................................49

Tenn. Code Ann. § 68-33-103 ..............................................................41

Wash. Rev. Code § 18.130.450.............................................................29

Wash. Rev. Code § 7.115.......................................................................29

Wash. Rev. Code § 74.09.675................................................................29

## Rules

Fed. R. Civ. P. 65(d) .............................................................................61

## Other Authorities

Exec. Order 14,168, 90 Fed. Reg. § 8615 (Jan. 20, 2025)
............................................... 10, 11, 20, 24, 25, 27, 39, 40, 41, 43, 46, 50, 51, 52

Exec. Order 14,187, 90 Fed. Reg. § 8771 (Jan. 28, 2025)
................................................ 10, 11, 20, 23, 24, 25, 27, 38, 39, 40, 46

Exec. Order 14,183, 90 Fed. Reg. 8757 (Jan. 27, 2025).........................12

Exec. Order 14,190, 90 Fed. Reg. 8853 (Jan. 29, 2025).........................12

Exec. Order 14,201, 90 Fed. Reg. 9279 (Feb. 5, 2025).........................12

Exec. Order 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ........................................36

Sarah M. Thornton, et al., *A systematic review of patient regret after surgery- A common phenomenon in many specialties but rare within gender- affirmation surgery*, 234 Am. J. Surg. 68 (2024) ....................................................7

*The Dangers of "Gender-Affirming Care" for Minors*, Federal Trade Commission, (July 9, 2025) ..................................................................................12

WPATH, *WPATH and USPATH Comment on the Cass Review* (May 17, 2024) ...........................................................................................................................48

# I.    INTRODUCTION

The executive orders challenged in this case reflect a breathtaking disregard for our Constitution and objective reality. Applying this Court's precedent, the district court entered an appropriately tailored preliminary injunction against sections of the orders within the Plaintiff States. This Court should affirm.

As part of a relentless campaign targeting transgender individuals and their families and medical providers, President Trump issued two executive orders relevant here. The first, Executive Order 14,168, creates a broad new federal definition of "gender ideology," which rejects the very idea that transgender people exist. Sections 3(e) and 3(g) of the Order then direct federal agencies to terminate any "[f]ederal funding of gender ideology." Meanwhile, Executive Order 14,187 defines a wide range of lifesaving, research-backed treatments for transgender youth as "chemical and surgical mutilation," and section 4 of that Order requires federal agencies to cut all research or educational grants to medical institutions that provide such care. In response to the Orders, multiple federal agencies immediately began terminating a range of grants and contracts in the Plaintiff States.

The district court correctly enjoined sections 3(e) and (g) of the first Order and section 4 of the second Order on two separate grounds. First, these new funding restrictions violate the separation of powers because Congress, not the President, holds the power of the purse, and Congress has not authorized or required the

funding restrictions imposed here. Second, these sections of the Orders unconstitutionally discriminate based on sex and transgender status, contrary to binding and undisturbed Ninth Circuit precedent. The district court therefore issued a narrow injunction limited to the Plaintiff States and these sections of the Orders. Defendants' objections on appeal are meritless.

Defendants first claim that Plaintiffs brought a facial challenge and have to prove that the executive branch could never constitutionally apply the Orders. But the premise is incorrect. Plaintiffs challenged only a few sections of the Orders as applied to funding of medical institutions in our own States. This Court has routinely and properly treated lawsuits like this one as as-applied challenges.

Defendants next argue that the Orders must be lawful because they include caveats saying that funding should be cut only as consistent with law. But this Court has rejected the idea that such pro forma savings clauses can rescue an unconstitutional order. *See City and County of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018). On Defendants' absurd theory, an executive order restricting federal funding to only white doctors could not be enjoined if its specific commands were accompanied by a boilerplate admonition to follow the law. No doctrine requires courts to engage in such willful blindness.

Lacking any meaningful response to the district court's separation of powers ruling, Defendants critique its equal protection holding by claiming that the Orders

cannot be discriminatory under *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). But unlike the law in *Skrmetti*, the Orders here explicitly discriminate based on transgender status and sex. Such discrimination is subject to heightened scrutiny under undisturbed Circuit precedent. And in any event, the Orders fail any level of review because Defendants do not even attempt to challenge the district court's factual finding that the Orders reflect a "bare desire to harm a politically unpopular group." ER-50 (quoting *Romer v. Evans*, 517 U.S. 620, 634 (1996)).

Finally, Defendants argue that the preliminary injunction is overbroad because it extends throughout the Plaintiff States. But Defendants fail to rebut the factual findings underlying the district court's order and never presented a workable narrower alternative that would give Plaintiffs complete relief. This Court should affirm the district court's limited and well-reasoned injunctive order.

## II.   STATEMENT OF THE ISSUE

The district court granted Plaintiffs' motion for a preliminary injunction against sections of two executive orders that condition federal funding without congressional authorization and discriminate against transgender youth; that would deny medical institutions in Plaintiff States billions of dollars they depend on for scientific research; that would deny Physician Plaintiffs' patients medical care they depend on; and that would force all state medical institutions and Physician Plaintiffs to choose between their ethical obligations to provide medically necessary gender-affirming care to their

communities or preserve their financial ability to keep their doors open. Was the district court's grant of a preliminary injunction within the sound exercise of its discretion?

## III.   STATEMENT OF THE CASE

### A.   Gender-Affirming Care Is Medically Necessary to Treat Gender Dysphoria and Overwhelmingly Supported by Evidence

Gender dysphoria is a serious medical condition marked by a persistent mismatch between a person's assigned sex and gender identity, causing severe distress or impairment. 5-SER-1264-65. "Left untreated, gender dysphoria may result in severe physical and psychological harms," *Skrmetti*, 145 S. Ct. at 1824, including severe anxiety and depression, eating disorders, substance abuse, self-harm, and, far too often, suicide, 5-SER-1266. Fortunately, it is treatable.

Providing such care, including for adolescents, is overwhelmingly supported by science and broadly endorsed by the medical community, including the American Academy of Pediatrics, American Medical Association, American Psychological Association, American Psychiatric Association, and American Academy of Family Physicians. 5-SER-1265-68, 1322-25.

When families seek gender-affirming care to treat gender dysphoria, clinicians follow settled guidelines, including those published by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, and found in the American Psychiatric Association's Diagnostic and

Statistical Manual of Mental Disorders (DSM-5). 5-SER-1323-24. Gender-affirming care for adolescents is generally a gradual course of care, utilizing social supports and medications that cause no permanent changes before considering medications with permanent effects. 6-SER-1474-76, 1487-89, 1498-1500. During initial visits, clinicians independently confirm the gender dysphoria diagnosis and then spend extensive time with families discussing the adolescent's experiences, goals and expectations, and the risks and benefits of different treatment options. 6-SER-1475-76, 1487-89, 1499-1500. Before any medical treatment begins, physicians obtain informed consent from both the patient and the parents. *Id.* Generally, this process is more thorough than for cisgender patients receiving the same medications with the same risks. 6-SER-1475-76. And it enables patients and their families to choose gender-affirming care when it is right for them and opt for different treatments where appropriate. *E.g.*, 6-SER-1478.

For adolescents, medical gender-affirming care (as distinct from social transitioning or mental health therapy) begins during or after the onset of puberty and takes two primary forms. First are GnRH agonists (also called puberty blockers), which delay puberty. 5-SER-1270. This "treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins, limiting the influence of a person's endogenous hormones on their body." 5-SER-1270. "In transgender youth, it is most typical to use GnRHa from the onset of puberty . . . until mid-

adolescence." 5-SER-1271. The second primary form of medical gender-affirming care for adolescents is hormone replacement therapy. 5-SER-1272-73. Hormone replacement therapy involves the administration of estrogen or testosterone to "facilitate development of sex-specific physical changes congruent with [a patient's] gender identity." 5-SER-1273.

For both treatments, patients receive regular follow-up care, typically every three months or more often, to monitor the patient's mental and physical health, conduct blood work, and adjust medications or other treatment as needed. 3-SER-815; 6-SER-1490-91, 1500. Given the frequency of check-ups, physicians providing this care describe having close, long-term relationships with both their patients and their families. 6-SER-1476, 1490-91, 1500-01. Gender-affirming care is associated with positive lifetime outcomes, such as lower depression and anxiety, increased overall functioning, and decreased risk of suicide. 1-SER-200-01.

The evidence supporting gender-affirming care is at least as robust as the evidence supporting many medical treatments for cisgender adolescents. 1-SER-200-01; 5-SER-1275-83, 1325-28. Clinicians have used puberty blockers for decades to treat gender dysphoria. *Id*. Patients receiving gender-affirming care have high rates of satisfaction and extremely low incidence of regret, with patients and parents typically only regretting not starting gender-affirming care sooner. 3-SER-662, 712, 723, 729, 746, 754, 760, 778, 785, 792-93, 815; 4-SER-874, 911, 929, 934,

6

976, 983, 1021, 1028, 1143; 5-SER-1171, 1197, 1274, 1282, 1335-36. Studies show patients' rates of regret for receiving gender-affirming care are exceptionally low, between about 0.3 and 1.1%— "significantly lower than rates of regret for other routinely sought healthcare services." *E.g.*, 1-SER-259; 3-SER-712-13; 5-SER-1274, 1335-36. Routine healthcare services with higher rates of regret include gastric bypass (5.1%), ventral hernia repair (11%), and diverticulitis surgery (32%). Sarah M. Thornton, et al., *A systematic review of patient regret after surgery-A common phenomenon in many specialties but rare within gender-affirmation surgery*, 234 Am. J. Surg. 68-73 (2024), https://www.americanjournalofsurgery.com /article/S0002-9610(24)00238-1/abstract.

Gender-affirming care is not particularly risky to an adolescent's fertility. Puberty blockers are reversible and do not impair fertility. *E.g.*, 5-SER-1276. Children experiencing medically precocious puberty are routinely treated with puberty blockers and have typical fertility in adulthood, and such medications are used to preserve fertility in patients with cancer and treat other pediatric conditions. 5-SER-1276, 1333. And while hormone replacement therapy "may impair fertility, this is not universal and may be reversible." 5-SER-1333. Further, patients are routinely offered ways to preserve their fertility before beginning gender-affirming hormones. *E.g.*, 3-SER-752, 792-93, 799; 4-SER-881, 957, 987; 5-SER-1333.

**B.    Transgender Youth and Their Families Depend on Gender-Affirming Care**

Transgender youth often endure extended and debilitating periods of depression, self-hatred, hopelessness, anxiety, self-harm, and suicidality before families seek gender-affirming care. *E.g.*, 4-SER-986-87, 992, 998-99, 1001-02, 1011-1012, 1027-28, 1041, 1084, 1094-95, 1156-57; 5-SER-1183, 1189-90, 1254. Evidence from transgender youth in Plaintiff States illuminates this torment. For example, L.L., a Seattle-area teen, would, for years, "rot in [] bed" all day, with no friends, struggling even to shower in a body he "hated." 5-SER-1254. A teen in southwest Washington spent days "curled up in the fetal position on the floor." 4-SER-1001. Some adolescents avoided bathing, showered in a bathing suit or in the dark, or covered up mirrors so they didn't have to see their own body. 3-SER-759, 771; 4-SER-1084; 2-SER-1189, 1254. Others engaged in self-harm, such as cutting or burning themselves, or developed eating disorders trying to slow the development of physical traits that caused them distress. *E.g.*, 3-SER-790-91; 4-SER-998-99, 1006, 1142, 1157; 5-SER-1183, 12001; 6-SER-1501. Many self-isolated and avoided going to school or out with friends. *E.g.*, 6-SER-1489. In the worst cases, adolescents took their own lives. 4-SER-1072-81; 6-SER-1493-94. Meanwhile, parents experienced profound grief seeing their children's pain, and urgently sought out psychological and medical resources to identify and address their children's

8

gender dysphoria. *E.g.*, 4-SER-981-983, 1001-02, 1011, 1100-01, 1119, 1123-24; 5-SER-1182-83, 1189-90, 1212-13.

After receiving gender-affirming care, adolescents' symptoms of anxiety and depression dramatically improve. *E.g.*, 3- SER-728, 732, 778, 791; 4-SER-910-11, 928-29, 933, 951-52, 957-58, 968, 976; 5-SER-1245; 6-SER-1489-90, 1501-02. Parents report transformative changes, with their kids experiencing "a rebirth" allowing them to "enjoy life." SER 4-SER-1119. Youth receiving treatment "blossom," (4-SER-928, 1002, 1074), experience newfound confidence that helps them "flourish," (4-SER-1164; 5-SER-1184; 6-SER-1484) and live "joyful," (2-SER-386; 4-SER-929, 958, 1107) lives. They "go from socially isolating themselves, engaging in negative internal dialogue, not going to school . . . to joining a club, and seeking out community." 4-SER-976. Treatment makes youth feel "like something inside of them is lighter" when "they no longer hate themselves." 4-SER-958. They feel "happier" (1-SER-283; 2-SER-351, 357, 381; 3-SER-656; 4-SER-909, 933, 958, 1002, 1028, 1095, 1101, 1158, 1164; 5-SER-1209; 1241, 1254; 6-SER-1477, 1489) and "confident" (2-SER-341, 351, 358, 396; 3-SER-656; 4-SER-929, 933, 983, 1002, 1132; 5-SER-1175; 1209, 1254; 6-SER-1479, 1501) The transformation "can be like flipping a light switch," with kids having increased energy and a renewed sense of self that reveals to parents just "how

9

much their child must have been suffering." 4-SER-909-10. The benefits of gender-affirming care are literally "life-giving." 4-SER-951.

## C. The Orders Unilaterally Defund Medical Institutions and Other Providers of Gender-Affirming Care

On January 20, 2025, President Trump issued Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender-Ideology Order); 90 Fed. Reg. § 8615 (E.O. 14,168). And on January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation" (Denial-of-Care Order); 90 Fed. Reg. § 8771 (E.O. 14,187).

The Gender-Ideology Order defines "sex," "female," and "male" in non-scientific and nonsensical ways and strips federal funding from any institution that "promote[s] gender ideology" by accepting that transgender people exist, that is, that gender identity is a distinct component of a person's sex which may differ from the sex they were assigned at birth. E.O. 14,168 §§ 2(a), (d), (e), (f), 3(e), (g).

The Denial-of-Care Order, in cruel and dehumanizing terms, redefines all gender-affirming care—including the use of reversible medications like puberty blockers by highly-trained physicians—as "chemical and surgical mutilation" and a "stain" on the Nation's history. Among other directives, Section 4 of the Order requires "[d]efunding" gender-affirming care by ordering each executive department or agency providing research or education grants to medical institutions to

10

"*immediately* . . . ensure that institutions receiving Federal research or education grants end" gender-affirming care for patients under nineteen. E.O. 14,187 § 4 (emphasis added).

After the Orders issued, several defendants began terminating funding to medical institutions providing gender-affirming care in reliance on these Orders, including institutions in and operated by the Plaintiff States. ER-4; 1-SER-114-120, 135-45; 2-SER-434, 453; 6-SER-1467. Defendants later rescinded the terminations either without explanation or due to court orders, including the preliminary injunction here. *Id.*

## D. The Orders Are Part of a Relentless Campaign Targeting Transgender People

The Orders were an early cannon shot in what has become this Administration's relentless assault against transgender people. Starting on his first day in office, President Trump targeted all aspects of transgender lives, halting their passport applications, ordering transfer of incarcerated transgender women to men's prisons, initiating a ban on transgender military service claiming transgender soldiers are not "honorable, truthful, or disciplined," barring female transgender student-athletes from "compet[ing] with or against" other women and girls, stopping children from being openly transgender at school, and making the denial of transgender existence a cornerstone of executive policy. *See, e.g.*, E.O. 14,168; Exec.

Order 14,183, 90 Fed. Reg. 8757 (Jan. 27, 2025); Exec. Order 14,201, 90 Fed. Reg. 9279 (Feb. 5, 2025); Exec. Order 14,190, 90 Fed. Reg. 8853 (Jan. 29, 2025).

The Administration has also waged an all-out assault to end gender-affirming care. As part of this campaign, Defendants have threatened investigations of doctors and other providers (1-SER-42-59), sent institutions official letters suggesting that such care violates federal law or falls below the standard of care for federal payment programs (1-SER-61-72), actively encouraged the public to report *to the FBI* providers of gender-affirming care (1-SER-74), weaponized the Federal Trade Commission into targeting gender-affirming care as consumer fraud, and issued "more than 20 subpoenas to doctors and clinics involved in preforming transgender medical procedures on children" premised on the same or similar theories. 1-SER-76-105; *The Dangers of "Gender-Affirming Care" for Minors*, Federal Trade Commission, (July 9, 2025), https://www.ftc.gov/news-events/events/2025/07/dangers-gender-affirming-care-minors. Many providers of gender-affirming care have buckled under the pressure. 1-SER-10-13, 19-20, 23-24, 29. This is precisely the goal: President Trump has repeatedly gloated that transgender adolescents increasingly have nowhere to go for care. 1-SER-107-109, 160; 2-SER-474; 5-SER-1428-1429, 1438.

**E.**    **Plaintiffs Filed Suit and the District Court Granted Preliminary Relief**

To halt this onslaught against state institutions and transgender youths, Plaintiffs Washington, Oregon, Minnesota, and Colorado sued on their own behalf, joined by three Physician Plaintiffs[1] suing on behalf of themselves and their current and future patients. ER-59-106. Plaintiffs challenge specific provisions of the Executive Orders, which threaten to withhold billions of dollars from the Plaintiff States and force Plaintiffs into the impossible choice of fulfilling their ethical duties to provide the best care to their patients or maintaining their viability as medical and research institutions. *E.g.*, 1-SER-2-13, 247-51, 255-62; 3-SER-684-89, 735-48, 770-74, 782-86, 795-801, 807-15, 862-65; 4-SER-892-96, 941-45, 961-95; 6-SER-1458-71, 1482-84, 1492-95, 1503-06.[2]

The district court granted the Plaintiffs' motion for a temporary restraining order against certain sections of the order, ER-107-08; 2-SER-544-71, and largely granted the Plaintiffs' subsequent motion for a preliminary injunction against certain sections. *See* ER-6-58. The Court held that Plaintiffs were likely to succeed on the merits of their separation of powers and equal protection claims. ER-28, 49-51. The Court held "Section 4 of the [Denial-of-Care Order] and Sections 3(e) and (g) of the

---

[1] The Physician Plaintiffs, along with witnesses who submitted declarations using initials, were granted leave to proceed under pseudonym. 1-SER-207.

[2] Plaintiffs also challenged section 8(a) of the Denial-of-Care Order, but that is not at issue in this appeal.

[Gender-Ideology Order] purport to condition congressionally appropriated funds in a manner that effectively rewrites the law," and "usurp Congress's legislative role and thus amount to an end run around the separation of powers." ER-68.

The district court also held that these sections of the Orders violated equal protection principles. It applied heightened scrutiny to both Orders because each discriminated on the basis of transgender status and sex. Specifically, the Denial-of-Care Order "conditions grant funding *based on* whether grant recipients provide medical services (1) to transgender individuals or (2) for the purpose of treating gender dysphoria." ER-35. And the Gender-Ideology Order "revoke[s] federal funding for grant recipients who promote gender ideology, i.e., the false claim that males can identify as women and vice versa." *Id.* (citation modified). The Court found that Defendants submitted "no evidence" themselves and did not even test Plaintiffs' evidence, but instead sought to "prop up the bare conclusions made in the [Denial-of-Care] Order with post hoc rationalizations and justifications that are nowhere to be found in the Order's text." ER-46. The Court found the Denial-of-Care Order was both too narrow and too broad to support its stated purpose: it "is not limited to children, or to irreversible treatments, nor does it target any similarly risky or irreversible medical interventions performed on cisgender youth." ER-38. And on the Gender-Ideology

14

Order, the court found it had no legitimate purpose at all and was merely a tool of invidious discrimination. ER-50 (quoting *Romer*, 517 U.S. at 634).

The Court readily found that Plaintiffs would likely be irreparably harmed absent a preliminary injunction, noting funding revocations had already been announced and the White House's own boasts that the "[Denial-of-Care Order] was 'already having its intended effect' by causing the discontinuation of care at medical institutions around the country." *Id.* And the court cited Physician Plaintiffs' uncontested standing to assert rights of their current and future transgender patients who would undisputedly be harmed if suddenly "deprived of gender-affirming care." *Id.*

Defendants appealed the preliminary injunction, and the district court shortly thereafter stayed further proceedings pending resolution of the appeal. 1-SER-121-28. Defendants moved to stay the preliminary injunction, and that motion is pending as of the filing of this brief. *See* 6-SER-1572-1580.

## IV.   SUMMARY OF ARGUMENT

This Court should affirm the district court's preliminary injunction. Defendants come nowhere near meeting their burden to show that the district court abused its discretion in holding that each of the *Winter* factors supported preliminary injunctive relief, and that enjoining the Order's defunding provisions was necessary to provide Plaintiffs complete relief.

Plaintiffs are likely to succeed on the merits of their claims. The Orders violate the separation of powers under this Court's controlling decision in *San Francisco*, because they condition federal funds without congressional authorization. 897 F.3d 1225. *San Francisco* specifically rejected Defendants' nearly exclusive reliance on boiler-plate savings clauses to redeem the Orders because such clauses "do[] not and cannot override [their] meaning." *Id.* at 1240.

The Orders also violate equal protection guarantees. Unlike in *Skrmetti*, the Orders here explicitly discriminate based on transgender status and sex. 145 S. Ct. 1816. Such discrimination is subject to heightened scrutiny under undisturbed Circuit precedent. In any event, the Orders would fail any level of review because Defendants do not even attempt to challenge the district court's factual finding that the Orders reflect a "bare desire to harm a politically unpopular group," and are doubly unconstitutional on this ground. *See* ER-50.

Defendants' primary argument on the merits—that Plaintiffs cannot meet the standard applicable to facial challenges—is entirely unavailing. Plaintiffs' challenge is not a facial one under binding precedent. This case targets limited, specific aspects of the Executive Orders.

The district court also found that Plaintiffs had demonstrated irreparable harm of the highest order, with lives of transgender youth hanging in the balance. Without the preliminary injunction, the court found that providers would stop providing

16

gender-affirming care in the Plaintiff States, with catastrophic impacts to transgender youth, including increased depression, anxiety, and suicidality. Plaintiff States would also lose billions of dollars, compromising scientific and medical research.

Finally, the district court properly tailored the injunction's scope to provide complete relief to the parties. Defendants' half-baked alternatives would leave the Plaintiffs unprotected and the district court with an unworkable mess. This Court should affirm the district court in full.

## V. STANDARD OF REVIEW

This Court reviews a district court's grant of a preliminary injunction, including its scope, for abuse of discretion. *Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc). It reviews conclusions of law de novo and findings of fact for clear error. *Id.*

## VI. ARGUMENT

### A. The District Court Correctly Concluded Plaintiffs Are Likely to Succeed on the Merits

#### 1. Unilaterally conditioning funding of medical institutions violates the separation of powers

The Orders violate the separation of powers under this Court's controlling decision in *San Francisco*. 897 F.3d 1225. There, this Court unequivocally held that President Trump usurped Congress's spending and legislative powers during his first

17

term by unilaterally conditioning funds appropriated by Congress to further his own immigration-related policy objectives. Despite this clear-cut ruling, the Orders do exactly what *San Francisco* prohibits, commanding federal agencies, without congressional authorization, to cut off federal research and education grants to which the President objects.

In challenging the preliminary injunction, Defendants never dispute that President Trump cannot unilaterally condition appropriated funds. They instead offer a series of tepid deflections, claiming the Orders don't mean what they plainly state and mischaracterizing Plaintiffs' case as a facial ultra vires challenge to artificially ratchet up Plaintiffs' burden of proof. But these arguments cannot withstand the slightest scrutiny. The Orders are plainly unconstitutional under controlling law.

### a. The Orders usurp Congress's spending and legislative authority

*San Francisco* controls this case. There, this Court affirmed a permanent injunction of an executive order that commanded federal agencies to defund so-called sanctuary cities. *San Francisco*, 897 F.3d at 1231. Specifically, the order directed that federal officials, "in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes . . . . " *Id.* at 1232-33. The order stated that its purpose

18

was "to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373"—a statute prohibiting states from restricting local governments from sharing or receiving information from federal immigration officials. *Id.*

This Court held unequivocally that the funding conditions violated the separation of powers. The Constitution "exclusively grants the power of the purse to Congress, not the President." *Id.* at 1231. This spending power is "directly linked to [Congress's] power to legislate." *Id.* (citing *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980))).

"When it comes to spending," the President has "none of 'his own constitutional powers'" to rely upon. *Id.* at 1233-34. Nor does the President have authority to "enact, to amend, or to repeal statutes." *Id.* at 1232 (citing *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)). This means that the President "may not redistribute or withhold properly appropriated funds in order to effectuate [his] own policy goals." *Id.* at 1235 (citing U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause)). "Aside from the power of veto," this Court held that "the President does not have unilateral authority to refuse to spend the funds[;]" nor can the President "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* at 1232. Rather, given the President's obligation to "take Care that the Laws be faithfully executed," the

President is affirmatively obligated to distribute funds appropriated by Congress without adding unauthorized conditions. *Id*. at 1234. Because Congress had not "authorize[d] withholding of funds" to sanctuary cities, this Court held that President Trump and the executive branch "violate[d] the constitutional principle of the Separation of Powers" by claiming "for itself Congress's exclusive spending power" and attempting to "coopt Congress's power to legislate." *Id* at 1235.

The Orders here violate the separation of powers in precisely the same way: by unilaterally conditioning congressionally-appropriated funds based on the President's—not Congress's—policy objectives. Section 1 of the Denial-of-Care Order explicitly identifies its purpose: that the United States "will not fund, sponsor, promote, assist, or support" the provision of lifesaving gender-affirming care. E.O. 14,187 § 1. To that end, the Order directs federal agencies "that provides research or education grants to medical institutions, including medical schools and hospitals," to "immediately" "ensure that institutions receiving Federal research or education grants end" gender-affirming care. *Id*. § 4.

The Gender-Ideology Order similarly declares its purpose as ensuring that "[f]ederal funds shall not be used to promote gender ideology." E.O. 14,168 § 1. It commands federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). It directs that "[f]ederal funds shall not be used to promote gender ideology," requiring agencies to "assess

20

grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

But Congress never authorized any of these conditions. In ten years of appropriation bills, Congress never conditioned the receipt of federal funds on depriving patients of gender-affirming care or refusing to recognize the existence of transgender Americans. 6-SER-1465; 3-SER-689, 805, 869. Below and here, Defendants fail to identify a single law in which Congress conditioned the receipt of federal funds on denying gender-affirming care or refusing to recognize transgender identity. *See generally* 1-SER-210-240; Opening Br. No such law exists.

In fact, the opposite is true: Congress has passed numerous laws *prohibiting* sex-based discrimination in health care and has outlawed federal interference in the practice of medicine and patients' private medical decisions. For example, both Medicare and Medicaid limit federal interference in medical decisions by practitioners and guarantee individuals the right to make their own choices about needed medical care. *See, e.g.*, 42 U.S.C. §§ 1395, 1396a(a)(23). Similarly, the Affordable Care Act prohibits discrimination on the basis of sex by any health program receiving federal assistance. *Id*. § 18116. While Plaintiffs do not need to show the Orders violate these statutes to demonstrate a violation of separation of powers, these laws underscore that Congress has never authorized federal agencies to interfere with the medical decisions of individuals and their providers, or to

21

require hospitals to engage in the type of sex-based discrimination that the Orders command.

By attaching conditions to federal funding that were not authorized by Congress, the Orders usurp Congress's spending, appropriation, and legislative powers. *San Francisco*, 897 F.3d at 1231; *Clinton*, 524 U.S. at 438. The district court thus properly found that the Orders here, like the executive order in *San Francisco*, "direct[] Executive Branch administrative agencies to withhold funding that Congress has not tied to compliance with" the President's policy objectives. 897 F.3d at 1231; *see* ER-27-28. As such, "there is no reasonable argument that the President has not exceeded his authority." ER-27-28.

### b. Defendants' arguments conflict with precedent, the plain text of the Orders, and unchallenged factual findings of the district court

Unable to dispute that the President lacks constitutional authority to unilaterally condition congressionally appropriated funds, Defendants instead turn somersaults to deflect from the Orders' explicit commands. Defendants cite the Orders' generic savings clauses, mischaracterize Plaintiffs' claims, and extrapolate imaginary rulings from an inapposite two-paragraph stay decision by the Supreme Court. But Defendants' arguments conflict with *San Francisco*, the district court's factual findings, and common sense, and should be rejected by this Court.

### (1) Generic savings clause language cannot override the Orders' explicit purpose and commands

22

Defendants argue that the Orders do not mean what they plainly say because generic savings-clause language in the Orders override their explicit commands. But this exact argument was rejected in *San Francisco* and is belied by the district court's unchallenged finding that agencies actually started terminating federal funding as soon as the ink was dry on the Orders. ER-15-16.

This Court rejected this same savings-clause argument in *San Francisco*. Defendants there similarly argued that the executive order did not mean what it said because of "three words: 'consistent with law.'" *San Francisco*, 897 F.3d at 1239. They claimed the order did not actually require defunding sanctuary cities because it only directed that federal agencies "in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants." *Id*. at 1232-33. This Court rejected that argument, applying the bedrock rule that "[s]avings clauses are read in their context," and "cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language.'" *Id*. (citation omitted). Construing the savings clause consistently with the order's "object and policy,'" this Court held that the savings clause "cannot override" the order's explicit commands to condition federal funding on compliance with the administration's policy preferences.

This holding applies squarely here. The Orders here expressly identify their purpose to "end" the provision of gender-affirming care to transgender youth and funding of so-called "gender-ideology." E.O. 14,187 §§ 1, 4; E.O. 14,168 §§ 1, 3(e), (g). To that end, the Orders unambiguously command the same type of action at issue in *San Francisco*: to "immediately" "ensure that institutions receiving Federal research or education grants end" gender-affirming care (E.O. 14,187), to "end the Federal funding of gender ideology," and to ensure that "federal funds shall not be used to promote gender ideology." E.O. 14,168 § 3(e), (g).

Defendants' effort to distinguish *San Francisco* only underscores its similarities to this case. Defendants claim the executive order there differs because it "directed noncompliant jurisdictions be denied *all* federal grant dollars," and because "conditions had already been imposed on grants within the Attorney General's purview before the executive order was issued[.]" Opening Br. 34. But Defendants don't point to any language in the Orders here exempting any federal funding from the Orders' commands. Instead, Defendants make this argument based solely on the savings clause language itself (Opening Br. 23), which under *San Francisco*, cannot override the Orders' specific directives.

If anything, the commands here are even more explicit and direct than in *San Francisco*. There, the executive order granted agencies at least some "discretion," whereas the Orders here do not. While Defendants assert dozens of times in their

24

briefing that the Orders here only direct them to use their "discretion" to condition funds, the word "discretion" appears nowhere—not once—in either Order. *See* E.O. 14,187; E.O. 14,168; *compare San Francisco*, 897 F.3d at 1239 (executive order language directing federal agencies to exercise "discretion").

Further, just as in *San Francisco*, the agencies' actions here confirm the Orders' command of immediate action. Defendants ignore the district court's finding that the Orders had already caused two defendant agencies to send notices to grant recipients "(1) commanding them to 'immediately' stop using federal funding for any activities that do not align with the [Denial-of-Care Order] and the [Gender-Ideology Order], and (2) pronouncing that '[a]ny vestige, remnant, or re-named piece' of any programs in conflict with the Executive Orders is terminated." ER-52 (citing 6-SER-1367; 2-SER-453). And within days of their issuance, the White House itself crowed that the Orders were "already having [their] intended effect" and identified hospitals that had been coerced into curtailing or eliminating gender-affirming care. 5-SER-1428; *see, e.g.*, 3-SER-653-58. Even after the preliminary injunction issued, Defendant agencies continued to cancel federal grants issued to institutions in the Plaintiffs States pursuant to the Orders, only reinstating such grants on threat of contempt. 1-SER-114-20. Although they've been forced to rescind some of them, Defendants' own actions and statements establish that the Orders are not merely "sheep in wolves' clothing"; instead, "the agencies'

immediate implementation of the Executive Orders emphatically demonstrates that 'this wolf comes as a wolf.'" ER-52 (quoting *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting)).

### (2) Congress did not delegate authority to Defendants to set medical standards of care

Defendants suggest that Congress can delegate discretion to agencies to condition federal funds, but this Court need not consider this argument. Defendants provide no support for this argument beyond a bare citation to a single law, the Public Health Service Act, 42 U.S.C. § 241 et seq., without identifying any specific language granting agencies such authority or explaining how the statute applies to this case. Opening Br. 26-27; *see also* 1-SER-240-70 (failing to explain this argument before district court). Defendants' bare citation fails to meaningfully present or preserve any argument that Congress delegated authority to Defendants to condition federal funds as commanded in the Orders. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim[.] Judges are not like pigs, hunting for truffles buried in briefs."). As such, this Court need not consider this argument.

But even if this Court were to reach the issue, Defendants' argument fails. In a sleight of hand, they argue that nothing in the Public Health Services Act requires "that grants be used to support 'gender affirming care' or 'gender ideology.'" Opening Br. 27. But that's beside the point; the Orders challenged here require

federal agencies to *cut* funding to institutions that provide gender-affirming care or that acknowledge gender-identity. E.O. 14,187 § 4 (requiring institutions receiving federal funds "end" gender-affirming care); E.O. 14,168 §§ 3(e), 3(g) (same, with regard to gender ideology). For that reason, the Orders here do something "not even Congress may do: 'surprise[] states with post acceptance . . . conditions' on federal funds, and 'impose conditions on federal grants that are unrelated to the federal interest in particular national projects or programs.'" ER-27 (quoting *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019)). "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *cf. Biden v. Nebraska*, 600 U.S. 477, 505-507 (2023) (because one of "Congress's most important authorities is its control of the purse," courts require "clear congressional authorization" for agency to allocate "billions of dollars of spending each year.").

The need for a clear and unambiguous grant of congressional authority is heightened where, like here, agencies seek to dictate the practice of medicine. Congress must "convey its purpose" "clearly" where a statute would "alter the federal-state framework by permitting federal encroachment upon a traditional state power." *United States v. Bass*, 404 U.S. 336, 349 (1971). Regulating medical care and setting the standard of care is a quintessential exercise of states' traditional police power. *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387 (2002); *Dent*

*v. West Virginia*, 129 U.S. 114, 122 (1889); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). "[T]he background principles of our federal system" require more than "muffled hints" to delegate the power to regulate medicine to executive officials. *See Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).

Defendants do not argue that the Public Health Services Act or any other law unambiguously commands recipients of federal funds to end gender-affirming care or to disavow gender-identity as a condition of receipt of federal funds.[3] To the contrary, through the Public Health Service Act, Congress explicitly directs the federal government to prioritize "research related to the health of sexual and gender minority populations[.]" 42 U.S.C. § 283p. Defendants' argument thus fails on its own terms.

Moreover, adopting Defendants' arguments here would permit an unprecedented intrusion into states' historical authority to govern the practice of medicine. Here, as in *Gonzales*, the Orders purport to make "illegitimate a medical standard for care and treatment of patients that is specifically authorized under state law." *Gonzales*, 546 U.S. at 258. Each of the Plaintiff States has exercised its police

---

[3] Defendants' argument also ignores that the federal government recently tried to implement the Gender-Ideology Order by cutting off funding under the Public Health Service Act for projects that allegedly promoted "gender ideology," *inter alia*, and a district court enjoined those directives, calling them "breathtakingly arbitrary and capricious." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-10787-WGY, 2025 WL 1822487, at *16 (D. Mass. July 2, 2025), *granting stay in part*, 2025 WL 2415669 (Aug. 21, 2025).

powers to authorize and protect gender-affirming care, including to transgender youth. Washington, for example, makes clear that the provision of or participation in any gender-affirming treatment consistent with the standard of care in Washington by a license holder does not constitute unprofessional conduct subject to discipline. Wash. Rev. Code § 18.130.450; 3-SER-682. It also enacted the Gender Affirming Treatment Act to protect the rights of insured individuals seeking coverage for gender-affirming medical treatment. Wash. Rev. Code § 74.09.675. Washington has also enacted a shield law protecting providers and patients in providing or obtaining gender-affirming treatment. Wash. Rev. Code § 7.115. As part of the regulation of practice of medicine, Oregon and Minnesota likewise do not treat the gender-affirming care meeting standards of care as unprofessional conduct. 3-SER-768, 765. The Plaintiff States further ensure insurance coverage for gender-affirming care. 3-SER-699, 819; 4-SER-899.

Defendants do not and cannot point to an "unambiguous" authorization from Congress allowing Defendants to condition federal funding in this manner, or to intrude on the States' regulation of medical standards of care. No such law exists. To the contrary, as detailed above, Congress has passed numerous laws limiting the authority of federal agencies to dictate the practice of medicine and prohibiting the type of discrimination required under the Orders. *See supra* §VI(A)(1)(a).

Defendants' bare assertion that Congress delegated defendants the necessary authority to condition federal funds should be rejected.

### (3)    Plaintiffs did not assert a facial ultra vires claim

Unable to defend the Orders on their merits, Defendants incorrectly characterize Plaintiffs' complaint as a "facial" challenge and a non-statutory "ultra vires" claim, a strategy admittedly aimed at heightening Plaintiffs' burden of proof. Both arguments fail.

To start, the Plaintiff States bring an as-applied challenge, not a facial one. Defendants baldly assert otherwise, but do not appear to understand what a facial challenge is. The "distinction between facial and as-applied challenges" goes to "the breadth of the remedy employed by the Court, not what must be pleaded in a complaint" or proven in a preliminary injunction motion. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). A typical facial claim challenges "an entire legislative enactment" or executive order, whereas a "paradigmatic as-applied" claim "challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).

Here, Plaintiffs did not ask the district court to preliminarily enjoin the Orders in their entirety: nor did the district court do so. Plaintiffs only sought and the district court only ordered a preliminary injunction of certain subsections of the Orders as

applied to withholding federal funding for providing gender-affirming care to adolescents in the Plaintiff States. This is a prototypical as-applied challenge. *Hoye*, 653 F.3d at 857; *Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013). Because Plaintiffs did not seek to enjoin every possible application of the Orders, it should go without saying that they do not bear the burden of proving that every application of the Orders is unconstitutional.

*San Francisco*, again, underscores the fallacy of Defendants' argument. There, like here, the plaintiffs challenged subparts of an executive order directing the termination of federal grants, not the entire executive order. 897 F.3d at 1232 (focusing on § 9(a) of the executive order). And there, like here, the defendants did not "even attempt[] to show that Congress authorized it to withdraw federal grant moneys" with the type of unambiguous clarity required to condition federal funding on specific state action. *Id.* at 1234; *see also supra* §VI(A)(1)(b)(2). This Court had no trouble permanently enjoining the subsection of the executive order without applying *United States v. Salerno*, 481 U.S. 739 (1987). *San Francisco*, 897 F.3d at 1244.

But even if this Court were to treat this as a facial challenge, Defendants' arguments would still fail. As detailed above, Plaintiffs submitted ten years of appropriation bills to the district court, none of which contained the type of clear and unambiguous language required by Congress to condition federal funding,

particularly in an arena traditionally regulated by the states. *See supra* §VI(A)(1)(b)(2). Plaintiffs also identified numerous federal statutes prohibiting the type of sex-based discrimination and interference in individualized medical choices demanded here. *Id.* Defendants submitted no contrary evidence, forfeiting any argument that Congress authorized the President's actions here. *Id.* Defendants' fallacious efforts to ratchet up Plaintiffs' burden of proof thus cannot save the Orders.

Defendants' efforts to repackage Plaintiffs' arguments as an "ultra vires" claim similarly flounder. Over and over again, Defendants incant "ultra vires" like a magic talisman that will win them the case by saddling the Plaintiff States with a "near-insurmountable burden." Opening Br. 21. But this is a bread-and-butter Constitutional claim: the President issued Executive Orders that violate the Constitution, and it is well-established that injured parties—like, undisputably, the Plaintiff States here—are entitled to declaratory and injunctive relief to prevent such unconstitutional federal action. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."); *San Francisco*, 897 F.3d at 1233-35. Indeed, this Court recently affirmed a district court's preliminary injunction in a similar constitutional challenge to President Trump's Executive Order purporting to

eliminate birthright citizenship. *Washington v. Trump*, 145 F.4th 1013, 1019 (9th Cir. 2025). In doing so, this Court had no trouble finding that Plaintiffs were likely to succeed in showing that the Executive Order violated the Fourteenth Amendment. Plaintiffs bring similar constitutional claims here, which are clearly cognizable under binding Circuit precedent.

The cases cited by Defendants, *Nuclear Regulatory Commission v. Texas*, 145 S. Ct. 1762, 1775-76 (2025), and *Federal Express v. United States Department of Commerce*, 39 F.4th 756, 766 (D.C. Cir. 2022), are irrelevant. In each case, the plaintiffs alleged that agencies had exceeded their *statutory* authority, not that the President exceeded his *constitutional* authority. In *Nuclear Regulatory Commission*, for example, the plaintiffs sought to circumvent strict statutory limits on standing by "dress[ing] up a typical statutory-authority argument" for violations of the Atomic Energy Act as a non-statutory ultra vires claim. 145 S. Ct. at 682. And in *Federal Express*, the plaintiff sought to avoid a federal statute precluding review under the Administration Procedure Act by characterizing its statutory arguments under the 2018 Export Controls Act as a non-statutory ultra vires claim. 39 F.4th at 766. Because such claims could "become an easy end-run around the limitations of the Hobbs Act and other judicial-review statutes," the Supreme Court imposed limits on the types of statutory violations that can be asserted in such an ultra vires claim. *Id.* But Defendants' reliance on these cases attempts to force a square peg into a round

hole; these cases have nothing to do with the straightforward constitutional claims brought by Plaintiffs. Defendants do not and cannot cite any Supreme Court case applying such limits to claims that a President utterly lacked constitutional authority to command specific action.

At bottom, Defendants argue that Plaintiffs can never challenge the constitutionality of an executive order except when an agency acts "contrary to a *specific prohibition* in a statute." Opening Br. 19 (emphasis in original). But that is an absurd proposition, directly contradicted by countless decisions dating back to *Youngstown Sheet and Tube Company v. Sawyer*, 343 U.S. 579, 585 (1952), and continuing to *San Francisco* and *Washington v. Trump* (affirming birthright citizenship preliminary injunction). And, of course, the Supreme Court has recently affirmed the power of federal courts to enjoin unlawful funding decisions prospectively, exactly what the district court did here. *See Nat'l Inst. of Health v. Am. Public Health Ass'n*, 606 U.S. ---, No. 25A103, 2025 WL 2415669 at *2 (Aug. 21, 2025) (Barrett, J.); *id.* at *3 (Roberts, C.J.); *id* at *10 (Jackson, J.).

### (4)    The *AFGE* stay decision has no application here

In further deflection, Defendants focus more on the two-paragraph stay decision in *Trump v. American Federation of Government Employees* (*AFGE*), 606 U.S. ---, No. 24A1174, 2025 WL 1873449 (July 8, 2025), than on this Court's controlling decision in *San Francisco*. But *AFGE* has no application here.

*AFGE* involved an entirely different assertion of executive authority in a context in which Congress has explicitly authorized federal agencies to conduct reductions in force. *See, e.g.*, 5 U.S.C. §§ 3501-3504. The Supreme Court's determination in *AFGE* that the Government was likely to succeed in showing that the executive order directing agencies to begin planning reductions in force simply does not apply here. In this case, the district court properly determined that "none of the funds received by the Plaintiff States' medical institutions have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care." ER-27. Thus, unlike in *AFGE*, the President's authority in *this* case is at its "lowest ebb," by "purport[ing] to condition congressionally appropriated funds in a manner that effectively rewrites the law." ER-28. The Supreme Court's terse likelihood-of-success determination in *AFGE*, involving a different assertion of executive authority in connection with different federal statutes, is simply not relevant.

Defendants suggest that the Supreme Court only stayed the *AFGE* preliminary injunction because the "plans" directed by the executive order were not yet before the Court. Opening Br. 36. But it cites only Justice Sotomayor's concurrence for this point, which is not the Court's opinion. In any event, unlike in *AFGE*, the Orders here both commanded immediate action and actually triggered such action before the district court issued its preliminary injunction. *Supra* §VI(A)(1)(b)(1). In

35

contrast, the order in *AFGE* only required the Director of the Office of Management and Budget to "*submit a plan* to reduce the size of the Federal Government's workforce," "*initiate a rulemaking* to revise suitability criteria for federal employment in 5 C.F.R. § 731.202(b)," and "*undertake preparations* to initiate large-scale reductions in force (RIFs)." Exec. Order 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (emphasis added). Thus, even if the majority's likelihood-of-success determination had depended on the lack of agency action in that case, that assessment would have no bearing here, where the Orders both commanded and caused immediate action from agencies. *AFGE* is irrelevant.

### 2.    The Orders Unlawfully Discriminate Against Transgender Youth

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). Unlike the state law challenged in *Skrmetti*, both the Gender-Ideology Order and the Denial-of-Care Order explicitly target transgender people based on transgender status and sex, triggering heightened equal protection scrutiny. To survive intermediate scrutiny, the government "must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 59

36

(2017) (quoting *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996) (alteration in original)). "The Constitution's guarantee of equality 'must at the very least mean that a bare [governmental] desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 570 U.S. 744, 770 (2013) (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973)).

Given the district court's unchallenged factual findings here, Defendants cannot carry their burden to show that the Orders survive this "exacting" test. *VMI*, 518 U.S. at 533. And, in any event, the Orders' unmistakable anti-transgender animus fails any level of review.

> **a.** **The Orders are subject to heightened scrutiny because they discriminate based on transgender status and sex**

> **(1)** **The Orders discriminate based on transgender status and sex**

Heightened scrutiny applies to classifications based on transgender status and sex. *See, e.g.*, *Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (applying heightened scrutiny to discrimination based on transgender status); *Hecox v. Little*, 104 F.4th 1061, 1080 (9th Cir. 2024), *cert. granted*, No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) (applying heightened scrutiny to discrimination based on sex and transgender status). Under this Court's precedent, the Orders plainly warrant heightened scrutiny because they discriminate based on transgender status and sex.

First, the Orders create facial classifications based on transgender status. As the district court found, the Orders do not target particular treatments: they target particular people. For example, the Denial-of-Care Order classifies based on transgender and gender-diverse status by penalizing healthcare only when provided to "an individual who does not identify as his or her sex," "to align an individual's physical appearance with an identity that differs from his or her sex," or to "transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." E.O. 14,187 § 2(c). In other words, "federally funded institutions can offer puberty blockers to delay the onset of normally timed puberty to anyone except to 'an individual who does not identify as his or her sex.'" ER-34. This is true whether or not the medication is provided in connection with gender-affirming care. For example, a cisgender teen who needs puberty blockers in the course of cancer treatment could receive them from federally-funded institutions, but a transgender teen who needs puberty blockers due to the same diagnosis—and not to align with the teen's gender identity—could not. ER-34.

Even the second and third listed services of the Denial-of-Care Order, which reference medical purpose, must be understood from their context to apply only to transgender and gender-diverse people. Otherwise, as the district court recognized,

a voluntary vasectomy for an 18-year-old cisgender man who wished to avoid procreation would be prohibited, because it would likewise "'minimize or destroy [his] natural biological functions.'" 2-SER-546 (quoting E.O. 14,187 § 2(c)). Below, Defendants themselves admitted that this is not the Order's intent. *See* 1-SER-230-231. That is, Defendants all but admit that even if some services listed in the Order are written in arguably neutral terms, this neutrality "is a mere pretext for invidious sex [and transgender] discrimination." *Skrmetti*, 145 S. Ct. at 1833.

The Gender-Ideology Order similarly defunds any program that supposedly "promote[s] gender ideology," simply by acknowledging the reality that transgender people exist. *See* E.O. 14,168 §§ 1, 2(f), 3. This is textbook discrimination based on transgender status, not based on medical condition.

Second, the Gender-Ideology and Denial-of-Care Orders draw classifications based on sex. The purported biological sex of the patient is the basis on which the Denial-of-Care Order distinguishes between medical interventions that are restricted and penalized versus those that are not. *See Hecox*, 104 F.4th at 1080 ("[D]iscrimination against transgender individuals constitute[s] sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020))).

This Court's opinion in *Karnoski*, 926 F.3d 1180, is particularly instructive here. This Court found "unpersuasive" the government's argument that its exclusionary military policy was based on "gender dysphoria" and not transgender status because "[o]n its face, the [challenged policy] regulates on the basis of transgender status" and therefore "on its face treats transgender persons differently than other persons." *Id.* at 1201; *id.* (quoting policy that disqualified from military service "*[t]ransgender persons* with a history or diagnosis of gender dysphoria" and "*[t]ransgender persons* who require or have undergone gender transition are disqualified from military service"). The same is true here. By targeting "gender identity" and making certain care unavailable only to transgender patients, the Orders necessarily classify based on transgender status and sex. *See, e.g.*, E.O. 14,187 § 2(c) (prohibiting care for "an individual who does not identify as his or her sex"); E.O. 14,168 § 2 (defining "sex" to mean "an individual's immutable biological classification as either male or female").

And third, even if the challenged Orders were facially neutral—which they plainly are not—the Orders would still trigger heightened scrutiny as "covertly based on gender." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979). Given their stated goals, there can be no question that the Orders were fashioned "at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon" transgender adolescents. *Id.* at 279. That's because transgender adolescents are the

*only* group whose health care the Denial-of-Care Order seeks to "end," E.O. 14,187 § 1, and a main aim of the Gender-Ideology Order is to erase "[g]ender identity" as a "meaningful basis for identification," E.O. 14,168 § 2(g). These goals would trigger heighted scrutiny even if they were mere "collateral goal[s]" of the Orders. *Feeney*, 442 U.S. at 279. But here, gender-based goals are the Orders' entire raison d'être, and the Orders are subject to heightened scrutiny.

### (2) *Skrmetti* does not alter this Court's precedent

Defendants cling to *Skrmetti*, but that case does not control for several reasons. There, the Supreme Court determined that the Tennessee law at issue was facially neutral by drawing lines based on age and medical use. But here, the Orders explicitly discriminate on the basis of transgender status and sex.

In *Skrmetti*, the challenged law explicitly focused on the purpose of specific treatment: it prohibited medical treatments for individuals under 18 "for the purpose of: (A) Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103; *see also Skrmetti*, 145 S. Ct. at 1826-27 (citing the challenged law). The Court held that, absent evidence that the "prohibitions are pretexts designed to effect invidious discrimination against transgender individuals, the law does not classify on the basis of transgender status." *Skrmetti*, 145 S. Ct. at 1833. It further held the

41

Tennessee law did not discriminate on the basis of sex because it "prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex." *Id.* at 1829.

*Skrmetti* does not overrule this Court's precedents. *Skrmetti* did not address whether transgender people constitute a quasi-suspect class warranting heightened scrutiny under equal protection analysis. *See id.* at 1832-33. This Court's precedents are thus not "clearly irreconcilable" with *Skrmetti* as required to abrogate this Court's holdings in *Karnoski* and *Hecox*. *See, e.g.*, *Sexuality & Gender All. v. Critchfield*, No. 1:23-CV-00315-DCN, 2025 WL 2256884, at *5 (D. Idaho Aug. 7, 2025) (applying heightened scrutiny following *Skrmetti* based on this Circuit's precedent); *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Inst. of Health*, No. 25-CV-01620-LKG, 2025 WL 2377705, at *8 (D. Md. Aug. 14, 2025) (similar based on Fourth Circuit precedent). Defendants concede as much—instead arguing that the Court's precedents are "incorrect and should be overruled." Opening Br. 51. The Orders challenged here are unconstitutional under binding Circuit precedent.

And unlike the challenged state law in *Skrmetti*, the Orders here explicitly discriminate on the basis of transgender status and sex, not based on medical condition or age. Starting with the Gender-Ideology Order, it does not deny funding for institutions that treat or study gender-dysphoria or any other *medical condition*. It instead denies funding to any person or institution that "promote[s] gender

ideology," or the idea that people may have gender identities incongruent with the sex they were assigned at birth. *See* E.O. 14,168 §§ 1, 2(f), 3; *see also Am. Ass'n of Physicians for Hum. Rts., Inc.*, 2025 WL 2377705, at *14 (holding that withholding research grants concerning gender identity violated equal protection). Under that absurd definition, the Supreme Court's opinion in *Skrmetti* would amount to promoting "gender ideology," simply because it acknowledged the existence of transgender Americans, i.e., people whose "gender identity does not align with their biological sex." 145 S. Ct. at 1824. The Order targets the fact of being transgender itself and thus explicitly classifies based on transgender status, unlike the law in *Skrmetti*. For the same reason, it discriminates based on sex. This is not discrimination based on a medical purpose or age as in *Skrmetti*; it is a government attempting to force medical institutions and providers to pretend that trans people do not exist, and a blatant attempt to enforce sex stereotypes. *See id.* at 1832 (holding sex-based stereotypes subject to heightened scrutiny).

The Denial-of-Care Order is no different. As detailed above, the district court correctly determined that the order prohibits medical services for proscribed *people,* not just for proscribed purposes. *See also* ER-34. *Skrmetti* does not apply. 145 S. Ct. at 1834 n.3 (distinguishing a law that "regulates a class of *persons* identified on the basis of a specified characteristic").

### b. The Orders fail heightened scrutiny

To survive heightened scrutiny, the Orders must provide an "'exceedingly persuasive justification'" for their classifications and a "close means-end fit." *Sessions*, 582 U.S. at 58, 68 (quoting *VMI*, 518 U.S. at 531). The "burden of justification is demanding" and "rests entirely on the [federal government]." *VMI*, 518 U.S. at 533, 555. Heightened scrutiny is an "extremely fact-bound test," requiring courts to "examine the 'actual purposes'" of the governmental action and "carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 483 (9th Cir. 2014). Defendants flunk this test.

Defendants do not even attempt to challenge the district court's copious and well-grounded factual findings. Gender dysphoria is a serious medical condition, as the Supreme Court acknowledged in *Skrmetti*, and all major medical associations recognize that gender-affirming care is necessary to alleviate the significant distress of adolescents facing gender dysphoria. 145 S. Ct. at 1824; ER-31-33; 5-SER-1267, 1285; *supra* §III(A). Yet the Orders harm adolescents by restricting their access to this care and harm providers by penalizing them for providing it consistent with the standard of care. ER-34-51. There is no persuasive, non-discriminatory justification for singling out and criminalizing the medical decisions made by transgender youth,

their parents, and their doctors. Nor did Defendants even attempt to prove such a justification below. ER-46. Untreated gender dysphoria can result in severe anxiety and depression, self-harm, and suicidality. 5-SER-1266; *see also*, *e.g.* 4-SER-904-905, 959; 5-SER-1214.

Gender-affirming care dramatically improves the health and well-being of adolescent patients, is well-accepted in the medical field, and is supported by substantial clinical and research evidence demonstrating its effectiveness. 5-SER-1266-83; 6-SER-1498. The quality of evidence supporting this care is comparable to the quality of evidence supporting countless other medical treatments for minors. 5-SER-1326-27. And it is supported by decades of clinical experience and research demonstrating the often life-saving results of treatment. 5-SER-1323-25; 6-SER-1476-1481, 1487-1492, 1501-1503. And last but certainly not least, the personal experiences of transgender youths and their families reflect just how such treatment positively transforms the lives of the adolescents who need it. *See supra* §III(A)-(B). By penalizing this necessary care, the Orders will harm kids across the country, including Physician Plaintiffs' current and future patients.

Nor do Defendants challenge the district court's factual findings that gender-affirming care is not particularly risky. 5-SER-1275-76, 1333-35; *see also Poe v. Labrador*, 709 F. Supp. 3d 1169, 1182 (D. Idaho 2023). The same medications and treatments used in gender-affirming medical care—including puberty blockers,

testosterone, testosterone suppression, and estrogen—are widely used to treat cisgender adolescents and pose the same potential risks. 3-SER-714-715; 6-SER-1488-89. For example, GnRHa medications are used to treat precocious puberty; testosterone is used to treat cisgender boys with delayed puberty; and estrogen is used to treat cisgender girls for ovarian failure, regulation of menstruation, and contraception. 5-SER-1327, 1334, 1339. Again, in many cases, this treatment is *also used to affirm* the cisgender adolescent's gender—but the Orders say not a word about it. 3-SER-714-15.

The Gender-Ideology Order's stated purpose is also rebutted by the evidence. It purports to align national policy with "biological reality," (E.O. 14,168 § 1) but advances unscientific and false definitions of "sex," "male," and "female." *See generally* 2-SER-437-44; *see also* 5-SER-1261-64, 1283-84, 1315-17. It says that it seeks to defend women from "erasure of sex in language and policy," but the Order is grossly overbroad because it defines transgender people out of existence altogether and defunds any program that merely accepts the idea that transgender people exist. E.O. 14,168 §§ 3(e), (g).

The Denial-of-Care Order's purported concern over potential "sterilization" of youths (E.O. 14,187 § 1) is similarly unpersuasive. For one thing, the Order targets treatments, like puberty blockers, that have no impact on fertility. 5-SER-1333 Moreover, while some types of gender-affirming medical care may impair fertility,

this risk is discussed in the informed consent process, as with other medical treatments that can impact fertility. 5-SER-1332-34. And as the district court found, many patients receiving hormone therapy remain fertile and can be provided with fertility-preserving options. 2-SER-64-65; *see also* 5-SER-1276. There are also ways to adjust treatment to protect fertility if that is important to the patient and family. 5-SER-1333.

Further, similar or greater risks attend other pediatric treatments, but the Order singles out only gender-affirming care. 5-SER-1339. Finally, concerns about the low risks of permanent side effects ring hollow when youth denied treatment far too often make permanent decisions with much more tragic consequences. 5-SER-1284. Given the extensive evidence supporting gender-affirming care, no "exceedingly persuasive justification" exists for treating gender-affirming medical care differently than all other medical treatment for people under 19.

Even less persuasive is the Denial-of-Care Order's unsupported suggestion that people who receive gender-affirming care will regret that care. The district court found, based on undisputed evidence, that regret is exceedingly uncommon for transgender youth receiving gender-affirming care. *See* 3-SER-712-13, 792; 5-SER-1274, 1284; 6-SER-1480-81. And in any event, neither the Order nor Defendants even attempted to demonstrate why this small risk justifies banning care for all transgender adolescents, a particularly troublesome failure given the consensus of

the medical community that this care is medically appropriate and life-saving for certain transgender youth. 3-SER-712-13.

Thus, the district court was right to conclude that "[e]ven assuming . . . that the Executive Order's stated purpose . . . constitutes an important government interest, there is no substantial relationship between this purported goal and Section 4's blunderbuss approach to achieving it." 2-SER-562-63; *see also* 2-SER-564 (Denial-of-Care Order is "insufficiently tailored" to survive heightened scrutiny); *Hecox*, 104 F.4th at 1086 (law lacked means-end fit between categorical ban of transgender female athletes and purported interest in athletic equality based on law's broad enforcement mechanism).

Defendants' reliance on *Skrmetti*, which applied rational basis review to the Tennessee legislature's justifications, is a fig leaf.[4] 145 S. Ct. at 1826 (discussing

---

[4] Defendants fare no better with their glancing reference to the so-called Cass Review. *See* Opening Br. 53. Defendants do not and cannot demonstrate that the district court's rejection of the Cass Review was clear error given that it has been roundly criticized by medical associations and experts for its author's "negligible prior knowledge or clinical experience of trans and gender diverse youth or indeed transgender medicine and surgery," "its unfounded medical opinion[s]" that "ignore[e] more than three decades of clinical experience in this area as well as existing evidence showing the benefits of hormonal interventions on the mental health and quality of life of gender diverse young people," and its "selective and inconsistent use of evidence." ER-46-47 (quoting WPATH, *WPATH and USPATH Comment on the Cass Review* (May 17, 2024), https://wpath.org/wp-content/uploads/2024/11/17.05.24-Response-Cass-Review-FINAL-with-ed-note.pdf). Yet even despite its apparent biases, the Cass Review does not recommend banning treatment or wholly erasing the existence of transgender people.

legislative findings); Tenn. Code Ann. § 68-33-101 *et seq.* The Tennessee legislature's findings cannot suffice to meet the federal government's demanding burden here. Below, Plaintiffs submitted voluminous evidence—over 100 declarations from experts, providers, institutions, families, and youth about how gender-affirming care was consistent with the standard of care and saved lives. In rebuttal, Defendants submitted no evidence—zilch. It cannot be an abuse of discretion for the district court to find Defendants failed to meet heightened scrutiny when literally all of the evidence points one way. In the face of the Plaintiffs' *actual* evidence, Defendants' *ipse dixit* cannot carry their "demanding" burden. *VMI*, 518 U.S. at 533.

### c.     The Orders are rooted in animus

The district court correctly applied heightened scrutiny for the reasons described above. But both Orders would fail any level of scrutiny because they are based in anti-trans animus. *Romer*, 517 U.S. at 634 ("[A] bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." (citation modified)); *Moreno*, 413 U.S. at 534 (similar). The Orders' insistence that transgender people do not and cannot exist is cruelly false, and this Administration's bare-knuckled ambition to harm transgender youth through these orders and their unstinting campaign against trans people is illegitimate through-and-through.

49

Based on the record before it, the district court found as a matter of fact that the Gender-Ideology Order "is motivated by purposeful discrimination [and] violates the Fifth Amendment's equal protection guarantee." ER-50. Defendants offer nothing to rebut this. And it is plain to see. The Gender-Ideology Order establishes critical definitions such as "sex," "male," "female," and "gender identity"—which govern "all Executive interpretation of and application of Federal law and administration policy"—and without which the Denial-of-Care Order is incomprehensible. E.O. 14,168 § 2. This set of definitions, as the district court held, "denies and denigrates the very existence of transgender people." ER-50.

Through the Gender-Ideology Order, the Administration has been "candid in its rejection of the identity of an entire group—transgender Americans—who have always existed and have long been recognized in, among other fields, law and the medical profession." *Orr v. Trump*, 778 F. Supp. 3d 394, 415 (D. Mass. 2025). On its face, the Order announces that, for each and every purpose under federal law— regardless of medical consensus and reality—transgender women are not women and transgender men are not men. E.O. 14,168 §§ 1, 2(b)-(e). It describes the "biological category of 'woman' " as "true" and calls it a "false claim that males can identify as and thus become women and vice versa." *Id.* §§ 1, 2(f). It denies "that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f). The order also facially demeans transgender people's identity, stating that one's gender

identity "does not provide a meaningful basis for identification." *Id.* § 2(g). One "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025).

The Denial-of-Care Order is governed by these same definitions and is infected by the same animus. It calls GnRH agonists and hormone therapy, the same medical care described by transgender youth and their parents as "life giving" (*supra* §III(B)), as *chemical mutilation*. This "[m]oral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause." *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring). Both Orders were motivated by a "desire to harm a politically unpopular group" and violate the Fifth Amendment, regardless of what level of review this Court applies. *See Moreno*, 413 U.S. at 534.

While the Orders purport to "defend[] women" and "protect[] children," the President's actions—indeed, the language of the Orders themselves—show that their real purpose is to eradicate transgender people. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (courts "are not required to exhibit a naiveté from which ordinary citizens are free") (quotation omitted). This effort to erase trans Americans fails any level of review. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy, J., concurring); *see, e.g.*, *Dekker v. Weida*, 679 F. Supp.

3d 1271, 1293 (N.D. Fla. 2023) ("disapproving transgender status and discouraging individuals from pursuing their honest gender identities" are "plainly illegitimate purposes" demonstrating state law was adopted for "purposeful discrimination" against transgender people).

The Orders further impose a "broad and undifferentiated disability" on a discrete group of people. *Romer*, 517 U.S. at 632. The Gender-Ideology Order makes it the official "policy of the United States" to recognize only "two sexes" based on people's "immutable biological classification as either male or female." E.O. 14,168 § 2. The Denial-of-Services Order turns on the gender identity and biological sex of the patient. E.O. 14,187 § 2(c). Transgender youth—individuals who, by definition, have a gender identity different from their sex assigned at birth—are uniquely affected by these Orders.

More broadly, the Orders' animus is amply confirmed by the ongoing campaign of hostility waged against transgender people by the Trump Administration. *See supra* §III(D). As courts across the country have recognized, "the flurry of government actions directed at transgender persons—denying them everything from necessary medical care to access to homeless shelters—must give pause to any court." *Talbott v. United States*, 775 F. Supp. 3d 283, 331 (D.D.C. 2025). This Administration, for example, has adopted policies that: "recogniz[e] the existence of only two sexes; blocked schools from using federal funds to promote

the idea that gender can be fluid; directed the State Department to stop issuing documents that allow a third 'X' gender marker; changed references to 'LGBTQI+' on government websites to 'LGB,' erasing not just transgender persons, but intersex people as well; revoked the ability of transgender federal employees to receive gender-affirming care; and directed that all incarcerated transgender persons be denied medical treatments and be housed by birth sex, where they are nine times more susceptible to violence." *Id.* at 330-31; *see also* Dkt. 33, *In Re: Administrative Subpoena*, No. 1:25-mc-91324-MJJ (D. Mass. Sept. 9, 2025) (quashing DOJ's subpoena issued for improper purpose to a children's hospital, explaining "[t]he Administration has been explicit about its disapproval of the transgender community and its aim to end [gender-affirming care]"); *supra* §III(D).

The discriminatory animus evidenced by denying the very existence of a class of people is breathtaking. The Orders are "part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language." *Orr*, 778 F. Supp. 3d at 417; *cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-35 (1993) ("reject[ing] the contention" that a court's inquiry into whether a government acts with "hostility" toward religious belief "must end with the text of the laws at issue," and looking as well to a resolution adopted by the city council around the same time as the challenged ordinances). The Orders challenged here are "part of a coordinated and

rapid rollback of rights and protections previously afforded to transgender Americans," which "suggest[s]" that it is "built on a foundation of irrational prejudice toward fellow citizens whose gender identity does not match their sex assigned at birth." *Orr*, 778 F. Supp. 3d at 417-18. Such targeting runs afoul of the Constitution's guarantee of equal protection.

## B.    The District Court Correctly Found that Plaintiffs Were Likely to Suffer Irreparable Harm if the Orders Are Not Enjoined

Defendants come nowhere close to showing that the district court abused its discretion in finding that Plaintiffs, and the trans youth Physician Plaintiffs sue on behalf of, were likely to suffer irreparable injury in the absence of an injunction. On the contrary, these findings were based on "voluminous evidence, including expert testimony," that Defendants made no effort whatsoever to rebut. ER-8. The Plaintiff States' medical and research institutions each stand to lose hundreds of millions of dollars, threatening their ability to carry out their missions, if they do not comply with President Trump's illegal Orders. 1-SER-2-13, 247-251, 255-262; 3-SER-648-689, 735-748, 770-774, 782-786, 795-801, 807-815, 862-865; 4-SER-892-896, 942-945, 961-965; 6-SER-1458-1465, 1483-1484, 1492-1495, 1503-1506. And the Physician Plaintiffs' patients will undergo "permanent puberty changes," inconsistent with their gender identities, that only later surgeries could reverse. ER-53 (quoting 6-SER-1492-1493) (internal quotation marks omitted). These changes are likely to result in "higher rates of anxiety, depression, and suicidal

ideation." *Id.* (quoting 6-SER-1482-83) (internal quotation marks omitted). If the Orders challenged here have their intended effect of ending adolescent gender-affirming care, "there are going to be young people who are going to take their lives." *Id.* (quoting 6-SER-1504) (internal quotation marks omitted). This forces Plaintiff States and the Physician Plaintiffs into a "Sophie's choice": to either provide medically necessary healthcare to their patients as demanded by their ethical duties or give in to President Trump's illegal coercion to salvage the remainder of their institutions and practices. *See* ER-18. The district court was well within its discretion to find a likelihood of irreparable injury here.

Against this, Defendants retread their arguments that the Orders do not actually command agencies to do anything, let alone anything illegal. Opening Br. 58. As shown above (*supra* §VI(A)(1)(b)(1)), that's nonsense. Moreover, Defendants explicitly relied on these orders to cut funding to institutions in the Plaintiff States, and the district court's preliminary injunction caused funding cuts to be reversed. ER-4; 1-SER-114-120, 134-145; 2-SER-433-434, 452-453; 6-SER-1467.

Next, Defendants rely on *Skrmetti*'s legal holding that Tennessee's ban on gender-affirming care for minors was supported by a rational basis to argue that Physician Plaintiffs' patients will not be irreparably injured as a matter of fact. Opening Br. 58 (citing *Skrmetti*, 145 S. Ct. at 1836-37). But *Skrmetti*'s deference to

the judgment of the Tennessee legislature is entirely irrelevant to what the evidence shows in this case: imminent and irreparable injuries to youth in the Plaintiff States who are unable to access gender-affirming care and to medical institutions. *See* 145 S. Ct. at 1835 ("Under [the rational basis] standard, we will uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

Here, gender-affirming care is legal and protected in the Plaintiff States. Their institutions provide it. Coercing Plaintiffs States from offering such care will hurt Plaintiffs' institutions and Physician Plaintiffs' patients and will cost lives. The district court was right to find that the Plaintiffs will be irreparably harmed if the Orders are not enjoined.

**C.     The District Court Did Not Abuse Its Discretion in Concluding that the Balance of Equities Weighs in Plaintiffs' Favor, and that a Preliminary Injunction Is in the Public Interest**

The equities and public interest, which merge when the government is a party, tip unmistakably in Plaintiffs' favor. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024); *see also* 2-SER-570-71. The threat of harm to Plaintiffs, transgender children, and their families—detailed in well over 100 declarations—far outweighs the federal government's purported interests in immediately enforcing the Orders. Moreover, preserving Plaintiffs' constitutional rights is in the public interest. *See Melendres v.*

*Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (citation omitted)). This is doubly so here where the unconstitutional conduct stems from blatant anti-transgender animus. *See supra* §VI(A)(2)(c). The district court acted well within its discretion in concluding that the balance of equities justified preserving the status quo until the case can be decided on the merits.

On appeal, Defendants primarily claim an interest in "'protecting the physical and emotional well-being of youth.'" Opening Br. 59 (quoting *New York v. Ferber*, 458 U.S. 747, 757 (1982)). But here the district court found, as a matter of fact, that the Executive Orders will cause "dire harms to transgender youth deprived of gender-affirming care," including "higher rates of anxiety, depression, and suicidal ideation." ER-53-54. The expert testimony before the district court confirms this. 5-SER-1256-1377; 2-SER-437-447. The testimony of doctors and other health care professionals treating transgender adolescents confirms this. 1-SER-255-85; 2-SER-498-510; 3-SER-719-869; 4-SER-871-978; 6-SER-1458-1507. So too the testimony of parents. 1-SER-295-299; 2-SER-301-305, 311-404; 4-SER-979-1167; 5-SER-1169-1231. And so too, resoundingly, the testimony of trans youth and adults themselves. 2-SER-405-422; 3-SER-653-58; 5-SER-1232-1255. Literally every piece of evidence before the district court confirms the district court's conclusions and refutes Defendants' claim. Defendants have failed to introduce a single crumb

of evidence supporting the proposition that cutting off lifesaving care somehow *protects* children. Their argument that the district court abused its discretion by finding that the public interest, including the welfare of children, supports entry of the preliminary injunction is frivolous.

Equally misguided is Defendants' argument that the district court's order "improperly intrudes on the President's authority" to implement his policy prerogatives. Opening Br. 59. "[T]he Executive Branch does not have a legitimate interest in violating the Constitution." *Washington*, 145 F.4th at 1037.

## D. The District Court Did Not Abuse Its Discretion in Concluding that a Statewide Injunction Was Necessary to Provide the Plaintiffs Complete Relief

Finally, Defendants are wrong that the district court's Plaintiff State-specific injunction is overbroad. *Contra* Opening Br. 60-61. The Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), confirms that the district court did not abuse its discretion in reaching the factual conclusion that a Plaintiff State-wide injunction was necessary to protect the Plaintiffs from irreparable harm.

*CASA* addressed preliminary injunctions against President Trump's Citizenship-Stripping Order awarded to three types of plaintiffs—individuals, organizations, and states. The federal government sought to partially stay the injunctions "and limit them to the parties." *Id.* at 2549. In setting forth the type of injunctions it considered to be unauthorized, the Court distinguished between

"universal" injunctions, designed primarily to protect non-parties, and "traditional, parties-only injunction[s]," which, while more limited, "can apply beyond the jurisdiction of the issuing court." *Id.* at 2548 n.1 (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952)). As the Supreme Court explained, "[t]he difference between a traditional injunction and a universal injunction is not so much *where* it applies, but *whom* it protects[.]" *Id.*

The Court concluded that courts generally do not have the authority to issue so-called "universal" injunctions designed to protect "anyone, anywhere." *Id.* at 2560. But in so doing, the Court reiterated that injunctions that incidentally benefit non-parties are permissible. The Court reaffirmed the "complete-relief principle," explaining that "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at 2557 (citing *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). And courts may do so where, as a practical matter, the relief may "advantag[e] nonparties," since "they do so only incidentally." *Id.* at 2557 (citing *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)).

The district court carefully applied these principles in this case. It acknowledged "the general rule . . . that injunctions must 'be limited . . . only to named plaintiffs where there is no class certification,'" but noted that broader equitable relief affecting non-parties "'is acceptable where it is necessary to give

prevailing parties the relief to which they are entitled.'" ER-55 (quoting *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996), and *Hecox*, 104 F.4th at 1090). This is the same complete-relief principle the Supreme Court re-affirmed in *CASA*.

Because the district court's analysis hews closely to the Supreme Court's reasoning in *CASA*, Defendants do not (and cannot) contend the court misapplied the law. Instead, they are left to quibble with the court's factual conclusions that statewide relief was necessary to provide the Plaintiffs complete relief. But they come nowhere near showing that the court abused its discretion.

As the district court explained, "[h]aving closely examined the record, . . . statewide relief is not only appropriate, but essential to provide complete relief to Plaintiffs." ER-56. This is because the "voluminous record"—which Defendants have never made any effort to rebut—shows that the Orders restrict providers' abilities to provide care for their patients. *Id.* As the district court found, based on undisputed evidence, "a multidisciplinary approach is frequently necessary to address patients' medical needs[.]" *Id.* If state-employed physicians in the Plaintiff States can no longer work with "some members of patients' care teams" or make referrals to private physicians, specialists, psychiatrists, surgeons, occupational therapists, and other supports, their ability to provide the best care to their patients—to meet the standard of care and their ethical obligations—will

remain hobbled. *Id.* Thus, state-wide injunctions are necessary to provide complete relief for the States' proprietary harms.

Defendants attempt to sidestep the district court's factual conclusions by contending that the Plaintiff States should be required to identify every possible specialist whom this injunction should cover and dismiss the obvious administrability concerns as irrelevant. Opening Br. 70-71. This is wrong for four reasons.

First, administrability is undoubtedly an important concern for district courts exercising equitable jurisdiction. *See North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (holding that "what is workable" matters when selecting an equitable remedy) (quotations omitted). Defendants' blasé suggestion that a court cannot take into account whether a narrower injunction would even be feasible—an argument which rests entirely on a concurring opinion that only two Justices joined—is wrong. Opening Br. 62 (citing *CASA*, 145 S. Ct. at 2565 (Thomas, J., concurring)).

Second, the workability concerns of Defendants' hypothetical but undefined narrowed injunction are not merely challenging—they are impossible to square with Federal Rule of Civil Procedure 65. The Rule requires that an injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). Defendants' insistence that the district court's injunction be limited to "specific providers" who are "members of patients' care

teams," Opening Br. 62, ignores the obvious problem that this is not a static or discrete group. Care teams may shift for any number of reasons, new patients will seek care every day, providers will move in and out of states, and so on. There is no reasonable way for the district court to determine, *ex ante*, the universe of providers against whom Defendants cannot enforce their unlawful orders except on a statewide basis.

Third, the harm of the Orders is not limited to current care teams or providers. Rather, the Orders thwart the development of provider networks in the Plaintiff States. If the district court's injunction were restricted to current members of patients' care teams, new providers would still effectively be blocked from entering the field, even as existing providers are reducing services for transgender kids. *See, e.g.*, 4-SER-900; 6-SER-1504-05.

Fourth, the Physician Plaintiffs represent the interests of their minor patients, not just themselves, and properly seek relief on behalf of current and future patients. *See*, *e.g.*, *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 318 (2020) (plurality) ("We have long permitted abortion providers to invoke the rights of their actual or potential patients[.]") (citing cases); *id*. at 354 n.4 (Roberts, C.J., concurring) (agreeing with standing analysis); *Whitman-Walker Clinic, Inc. v. Dep't of HHS*, 485 F. Supp. 3d 1, 35 (D.D.C. 2020). Because current and future patients may lawfully seek gender-

affirming health care anywhere within the Plaintiff States, the district court correctly issued an injunction of the same scope.

## VII.   CONCLUSION

The Court should affirm.

RESPECTFULLY SUBMITTED this 12th day of September 2025.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ William McGinty*
NOAH G. PURCELL, WSBA #43492
Solicitor General
WILLIAM MCGINTY, WSBA #41868
TERA HEINTZ, WSBA #54921
ANDREW R.W. HUGHES, WSBA #49515
CRISTINA SEPE, WSBA #53609
CYNTHIA ALEXANDER, WSBA #46019
NEAL LUNA, WSBA #34085
LUCY WOLF, WSBA #59028
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Noah.Purcell@atg.wa.gov
William.McGinty@atg.wa.gov
Tera.Heintz@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Cynthia.Alexander@atg.wa.gov
Neal.Luna@atg.wa.gov
Lucy.Wolf@atg.wa.gov
*Attorneys for State of Washington*

LAURYN K. FRAAS, WSBA #53238
COLLEEN MELODY, WSBA #42275
Assistant Attorneys General

800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
Lauryn.Fraas@atg.wa.gov
Colleen.Melody@atg.wa.gov
*Attorneys for Physician Plaintiffs 1-3*


KEITH ELLISON
Attorney General of Minnesota

JAMES W. CANADAY
Deputy Attorney General
445 Minnesota St., Ste. 600
St. Paul, Minnesota 55101-2130
651-757-1421
james.canaday@ag.state.mn.us
*Attorneys for State of Minnesota*


DAN RAYFIELD
Attorney General of Oregon

LAUREN PATTERSON ROBERTSON
Senior Assistant Attorney General
1162 Court Street NE
Salem, OR 97301-4096
503-947-4700
lauren.robertson@doj.oregon.gov
*Attorneys for State of Oregon*


PHIL WEISER
Attorney General of Colorado

SHANNON STEVENSON
Solicitor General
LAUREN PEACH
First Assistant Attorney General
1300 Broadway, #10

64

Denver, CO 80203
720-508-6000
shannon.stevenson@coag.gov
lauren.peach@coag.gov
*Attorneys for State of Colorado*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 25-1922

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ William McGinty    **Date** | 9/12/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**      *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-1922

I am the attorney or self-represented party.

**This brief contains** | 13,996 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ William McGinty | **Date** | 9/12/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*