**No. 25-1922**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Western District of Washington

---

## REPLY BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................. 2

I. Plaintiffs Have No Likelihood of Success on the Merits of the Sweeping Facial Claims They Asserted .......................................... 2

    A. Plaintiffs' "Separation of Powers" Claim Is Meritless ............ 3

        1. Plaintiffs assert a facial, *ultra vires* challenge .............. 3

        2. The Executive Orders properly direct federal agencies in the exercise of their discretion ................. 11

    B. The Executive Orders Do Not Violate Equal Protection ...... 20

        1. The Executive Orders do not discriminate based on sex or transgender status ...................................... 20

        2. The Executive Orders easily survive rational basis review ............................................................... 20

        3. Plaintiffs' attempt to distinguish *Skrmetti* is unavailing ............................................................... 23

II. Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors ................................................... 31

III. At Minimum, the District Court's Multi-Statewide Injunction Is Overbroad ............................................................ 32

CONCLUSION ............................................................................. 34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ......................................................................... 9

*Building & Constr. Trades Dep't v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) ......................................................... 19

*City & County of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ................................................ 16, 17

*City of Los Angeles v. Barr,*
   929 F.3d 1163 (9th Cir. 2019) ...................................................... 14

*City of Los Angeles v. Barr,*
   941 F.3d 931 (9th Cir. 2019) .......................................................... 8

*Dalton v. Specter,*
   511 U.S. 462 (1994) ................................................................ 7, 8, 9

*Global Health Council v. Trump,*
   153 F.4th 1 (D.C. Cir. 2025) ........................................................... 9

*Hecox v. Little,*
   104 F.4th 1061 (9th Cir. 2024), *cert. granted,*
   145 S. Ct. 2871 (2025) .................................................................. 27

*Hoye v. City of Oakland,*
   653 F.3d 835 (9th Cir. 2011) ...................................................... 4, 6

*INS. v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.,*
   510 U.S. 1301 (1993) .................................................................... 32

*John Doe No. 1 v. Reed,*
   561 U.S. 186 (2010) ........................................................................ 5

*Karnoski v. Trump,*
   926 F.3d 1180 (9th Cir. 2019) ...................................................... 27

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ................................................................. 12, 15

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ...................................................................... 16

*Morton v. Ruiz,*
415 U.S. 199 (1974) ........................................................ 12, 14, 16

*Myers v. United States,*
272 U.S. 52 (1926) ........................................................................ 11

*Nuclear Regul. Comm'n v. Texas,*
605 U.S. 665 (2025) .......................................................... 3, 8, 10, 12

*PFLAG, Inc. v. Trump*:
766 F. Supp. 3d 535 (D. Md. 2025) ............................................ 10, 11
769 F. Supp. 3d 405 (D. Md. 2025) .................................................. 11

*Reno v. American C.L. Union,*
521 U.S. 844 (1997) ...................................................................... 4-5

*Reno v. Flores,*
507 U.S. 292 (1993) ................................................................ 3, 6, 12

*Sherley v. Sebelius,*
644 F.3d 388 (D.C. Cir. 2011) .................................................... 19-20

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ............................................................ 2, 33, 34

*Trump v. Hawaii,*
585 U.S. 667 (2018) .................................................................. 22, 23

*Trump v. Orr,*
No. 25A319, 2025 WL 3097824 (U.S. Nov. 6, 2025) ........................ 23

*United States v. Skrmetti,*
605 U.S. 495 (2025) ....... 1, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30

*Winter v. Natural Res. Def. Council,*
555 U.S. 7 (2008) .......................................................................... 32

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ........................................................................ 8

iii

**Statutes:**

Further Consolidated Appropriations Act, 2024,
   Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460 ................................. 15

42 U.S.C. § 241 ............................................................................... 15

42 U.S.C. § 283p ............................................................................. 15

**Regulations:**

2 C.F.R. § 200.211(c)(1)(ii) ....................................................... 16

45 C.F.R. § 75.210(b)(1)(ii) ....................................................... 16

**Other Authorities:**

Exec. Order No. 14,168 (Jan. 20, 2025) .............................. 13, 17, 18, 23

Exec. Order No. 14,187 (Jan. 28, 2025) .............................. 13, 18, 22, 26

## INTRODUCTION

The government's opening brief demonstrates the multiple errors in the district court's preliminary injunction. First, plaintiffs have no likelihood of success on the merits of the sweeping facial claims they assert. To begin, they misunderstand their burden to prove their "separation of powers" challenge to the Executive Orders, which requires them to prove at the very least that no circumstances exist under which any federal agency could validly implement the Orders' challenged funding provisions. Plaintiffs have not and cannot satisfy that burden because the Executive Orders permissibly direct federal agencies to exercise their discretion within applicable statutory limits. And plaintiffs' equal protection claim is foreclosed by *United States v. Skrmetti*, 605 U.S. 495 (2025), notwithstanding plaintiffs' misguided efforts to distinguish that case.

Plaintiffs also fail the other preliminary injunction factors. They cannot demonstrate irreparable harm in the absence of any agency action terminating or withholding the federal funds they receive under the Executive Orders, and their assertions that an agency might unlawfully do so are only speculative. The government, on the other

hand, is irreparably harmed by the injunction's improper intrusion into the workings of the Executive Branch and the President's ability to supervise and direct the work of subordinate officials.

At minimum, the district court's statewide preliminary injunction, covering four states, is overbroad, improperly granting relief to nonparties, and cannot survive *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

## ARGUMENT

### I. Plaintiffs Have No Likelihood of Success on the Merits of the Sweeping Facial Claims They Asserted

The district court's preliminary injunction rests on its conclusion that plaintiffs are likely to succeed on the merits on two of the four claims they assert in their amended complaint—that Section 4 of Executive Order 14,187 (Jan. 28, 2025) (Protecting Children EO) and Section 3(e) and (g) of Executive Order 14,168 (Jan. 20, 2025) (Defending Women EO): (1) violate the Constitution's separation of powers (Count 2); and (2) violate the Fifth Amendment's equal protection guarantee (Count 1). (ER-25–51; *see* ER-104–105.) Neither claim has merit for the reasons explained in our opening brief. Plaintiffs' counterarguments are unavailing.

A. **Plaintiffs' "Separation of Powers" Claim Is Meritless**

1. **Plaintiffs assert a facial, *ultra vires* challenge**

To begin, plaintiffs, like the district court, misunderstand their burden to prove their claim that the Executive Orders violate the separation of powers. As explained in our opening brief (Opening Br. 19–21), this claim presents a "facial" challenge to the lawfulness of Section 4 of the Protecting Children EO and Section 3(e) and (g) of the Defending Women EO. As such, plaintiffs must show that "no set of circumstances exists under which [these provisions] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993). As we further explained (Opening Br. 19), in asserting this claim, plaintiffs allege a nonstatutory *ultra vires* claim that seeks to enjoin actions agencies might take pursuant to these provisions of the Executive Orders, and such a claim can succeed "only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (emphasis omitted). Thus, to succeed here, plaintiffs must show that any hypothetical action an agency could possibly take

3

in response to the challenged provisions of the Executive Orders would contravene some specific statutory prohibition. Because plaintiffs cannot meet their burden to prove both a facial challenge and a nonstatutory *ultra vires* claim, they have failed to show likely success on the merits.

First, plaintiffs effectively concede that they cannot meet their demanding burden for a facial challenge. Instead, they mainly seek to recast their suit as an "as-applied challenge, not a facial one." (Br. 30.) But plaintiffs' challenge is a prototypical facial challenge. Plaintiffs quote *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011), for the proposition that "a typical facial claim challenges 'an entire legislative enactment' or executive order," and they point out that they "did not ask the district court to preliminarily enjoin the [Executive] Orders *in their entirety*." (Br. 30 (emphasis added).) Plaintiffs' quotation from *Hoye* omits crucial language: "As a general matter, a facial challenge is a challenge to an entire legislative enactment *or provision*." 653 F.3d at 857 (emphasis added). A plaintiff may thus bring a "facial challenge" even if they do not contend that every aspect of a statute or executive order is unlawful. *See, e.g., Reno v. American C.L. Union*, 521 U.S. 844,

4

858–60, 883 (1997) (addressing facial challenge to specific provisions of a statute).

Here, plaintiffs challenge Section 4 of the Protecting Children EO and Section 3(e) and (g) of the Defending Women EO—the provisions related to federal grants and funding—in their entirety. (*See* ER-104–105 (prayer for relief seeking blanket declaration that these provisions are "unconstitutional" and to "enjoin Defendants from implementing or enforcing" them).) The district court, moreover, "fully enjoined" the defendants (except President Trump) "from enforcing or implementing Section 4 of Executive Order 14,187 within the Plaintiff States" and "fully enjoined [the enjoined defendants] from enforcing Sections 3(e) or 3(g) of Executive Order 14,168 to condition or withhold federal funding based on the fact that a health care entity or health professional provides gender-affirming care within the Plaintiff States." (ER-58.) *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining that "what matters" is "that plaintiffs' claim and the relief that would follow ... reach beyond the particular circumstances of these plaintiffs" and a plaintiff must "satisfy our standards for a facial challenge to the extent of that reach").

5

Plaintiffs obviously have not challenged these provisions "as applied" only to their own "specific factual circumstance[s]," *Hoye*, 653 F.3d at 857, because they make no allegation that any of their own federal funding or grants have been affected by any agency action taken to implement or enforce these provisions, much less suggest that the Orders' lawfulness turns on any facts particular to their circumstances. Indeed, plaintiffs do not challenge any agency action at all. Instead, their claim is a broad challenge to the lawfulness of these provisions regardless of the context in which they might be applied—a paradigmatic facial challenge. Therefore, to sustain the preliminary injunction, plaintiffs must demonstrate that "no set of circumstances exists" under the challenged provisions of either Order could be lawfully applied. *Reno*, 507 U.S. at 301.

Second, plaintiffs similarly all but concede they cannot meet the burden for a nonstatutory *ultra vires* claim. Instead, plaintiffs again try to cast their suit as anything other than an *ultra vires* action, but those efforts fail. Plaintiffs' claim asserts that the challenged Orders are unlawful because "Congress never authorized" any conditions on funding that plaintiffs believe could flow from the Orders, asserting

6

that Congress never authorized such conditions "in ten years of appropriation bills" and that the government has "fail[ed] to identify a single law" authorizing such conditions. (Br. 21; *accord* Br. 22 (asserting Orders are unlawful because they "attach[ ] conditions to federal funding that were not authorized by Congress"); Br. 27 (asserting need for "clear and unambiguous grant of congressional authority"); Br. 29 (asserting absence of "'unambiguous' authorization from Congress allowing Defendants to condition federal funding in this manner").) As plaintiffs' brief makes clear, the essence of their claim is that the challenged provisions of the Executive Orders exceed the *statutory* authority and discretion delegated by Congress to the Executive Branch to direct the use of federal funds.

Despite their repeated reference to statutory authority, plaintiffs insist that they need not meet the standard applicable to an *ultra vires* claim because their suit is a freestanding equitable action "to prevent … unconstitutional federal action." (Br. 32.) But the Supreme Court has been clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). As the Court observed, there is no

7

support for "the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," and the Court has instead "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution, *see Dalton*, 511 U.S. at 473 & n.5.

Plaintiffs' discussions of other *ultra vires* cases illustrate the point. They describe *Nuclear Regulatory Commission*, 605 U.S. 665, as involving allegations "that agencies had exceeded their *statutory* authority." (Br. 33.) But every claim that an agency acted without statutory authority could easily be restated as an assertion that the agency's action is "a violation of the separation of powers" (ER-102) because "an agency literally has no power to act unless and until Congress confers power upon it," *City of Los Angeles v. Barr*, 941 F.3d 931, 938 (9th Cir. 2019) (cleaned up). Plaintiffs offer no principled way

to maintain the "well established" "distinction between claims that an official exceeded his statutory authority … and claims that he acted in violation of the Constitution." *Dalton*, 511 U.S. at 474.

Unsurprisingly, plaintiffs' apparent view that every action claimed to exceed statutory authority automatically gives rise to a constitutional "separation of powers" claim finds no support in the cases they cite. Aside from *Youngstown*—which *Dalton* itself distinguishes, 511 U.S. at 473—they rely on *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). (Br. 32.) There, healthcare providers brought a Supremacy Clause claim against state officials to enforce the Medicaid Act. The Court acknowledged an equitable "judge-made remedy" to enjoin unconstitutional actions by state and federal officers, but it emphatically rejected the argument that such remedy rested upon an implied right of action under the Constitution itself. 575 U.S. at 324–27. Thus, as the D.C. Circuit recently explained, *Armstrong* "rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review." *Global Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025).

Of course, if plaintiffs wanted to avoid the difficulties of satisfying the *ultra vires* standard of review, they could have awaited an actual agency action taken in reliance on the Orders here and then challenged that action through the Administrative Procedure Act or other applicable statutory review mechanism. But plaintiffs' choice to file without awaiting a concrete agency action that could be challenged in the ordinary course comes with a cost: even assuming that their claims are ripe, they can assert only a nonstatutory *ultra vires* cause of action, which sets a high bar for success. *See Nuclear Regul. Comm'n*, 605 U.S. at 681–82.

In sum, plaintiffs have plainly lodged a facial challenge to the provisions at issue here, and they have done so through an *ultra vires* suit. Plaintiffs' protestations to the contrary are all the more baffling given that (at plaintiffs' urging, *see, e.g.*, Dkt. 169 at 14) the district court here relied repeatedly on a temporary restraining order in a "nearly identical" (ER-57) case challenging the same provisions. *See PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535 (D. Md. 2025). The *PFLAG* court had no difficulty concluding—correctly—that the plaintiffs there "brought a facial challenge" and that they were asserting an "*ultra*

10

*vires*" claim, *id.* at 551, 555–56, and that court subsequently repeated those conclusions in granting a preliminary injunction, *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 425, 427 (D. Md. 2025) (holding that "separation of powers" claim alleged an "equitable *ultra vires* cause of action" and that the plaintiffs "brought a facial challenge").  The *PFLAG* district court erred in applying those standards, and the government has appealed the preliminary injunction there as well.  But there is no basis for treating this "nearly identical" (ER-57) claim as anything other than a facial, *ultra vires* claim.

> **2.    The Executive Orders properly direct federal agencies in the exercise of their discretion**

Plaintiffs properly do not dispute that the President has authority to require federal agencies to exercise their discretion within statutory limits.  *Myers v. United States*, 272 U.S. 52, 164 (1926).  As demonstrated in our opening brief, that is all the Executive Orders here do because their plain language directs agencies to avoid funding gender ideology and sex-transition interventions for children within the limits established by existing applicable law.  (Opening Br. 21–25.)  And there are a variety of circumstances under which agencies may lawfully

implement these directives, including when choosing between multiple applicants for a limited pool of funds, *see Morton v. Ruiz*, 415 U.S. 199, 230–31 (1974); when allocating lump-sum appropriations from Congress, *see Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993); and where the governing legislation authorizes such grant conditions. (Opening Br. 25–28.) Plaintiffs therefore cannot show that "no set of circumstances exists," *Reno*, 507 U.S. at 301, under which the challenged provisions of the Executive Orders could be lawfully implemented, much less that every conceivable action an agency might take under these provisions would be "entirely in excess of [the agency's] delegated powers and contrary to a specific prohibition in a statute," *Nuclear Regul. Comm'n*, 605 U.S. at 681 (emphasis omitted).

Plaintiffs invert ordinary principles by insisting that the government must prove the negative: they argue that the government has failed to show that any law "unambiguously commands recipients of federal funds to end gender-affirming care or to disavow gender-identity as a condition of receipt of federal funds" (Br. 28), or to identify any specific provision of an "appropriation bill[ ]" that "conditioned the receipt of federal funds on depriving patients of gender-affirming care

12

or refusing to recognize the existence of transgender Americans." (Br. 21.) And they fault the government for not "identifying any specific language" authorizing action consistent with the Orders. (Br. 26.)

That line of argument is mistaken in every respect. At the outset, as explained, it is plaintiffs' burden to prove their claims, not the government's burden to prove the negative. Additionally, the absence of specific statutory citations in the Orders is no surprise: a central point of the Orders is to direct agencies to "immediately" ascertain what "appropriate steps" they could take, "consistent with applicable law," to implement the President's directives. Protecting Children EO § 4; *see* Defending Women EO § 3(e), (g). Given the variety of agencies to which the order is directed and the variety of statutory authorities under which those agencies "provide[ ] research or education grants to medical institutions," Protecting Children EO § 4, the permissibility and contours of any action would necessarily vary.

More fundamentally, Congress does not need to expressly authorize every possible term or condition that may be applied to federal grants, much less every decision about what sorts of grantees to prioritize every time Congress appropriates money for a given purpose.

13

It is a fundamental precept of federal appropriations law that "the power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton*, 415 U.S. at 231. Accordingly, federal agencies may "create reasonable classifications and eligibility requirements" when allocating limited funds, so long as the agency's rules "remain consistent with the governing legislation." *Id.* at 230–32. And, as this Court has recognized, "an administration's policy goals may influence the selection of factors warranting additional consideration for awarding competitive grants." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1180 (9th Cir. 2019). So, what matters here is that Congress has never mandated that federal funds or grants be used to fund the sex-transition interventions at issue, and plaintiffs have not shown that an executive policy to avoid funding such interventions cannot be implemented with respect to *any* use of federal funds or grants by *any* federal agency.

Plaintiffs simply ignore these principles. They do not so much as cite, much less distinguish, *Morton* and *Lincoln*, even though the very

14

appropriation bills they cite (Br. 21) include lump-sum appropriations that agencies have discretion to allocate based on their view of how "resources are best spent" and "whether a particular program best fits the agency's overall policies." *Lincoln*, 508 U.S. at 193 (quotation omitted). For example, as discussed in our opening brief, the Public Health Service Act authorizes the Secretary of Health and Human Services to make grants to fund research for numerous purposes. Those grants are funded by lump-sum appropriations for "carrying out section 301 [42 U.S.C. § 241] and title IV of the PHS Act with respect to" multiple different areas of research, including "general medical sciences," "child health and human development," "mental health," and "human genome research," among others. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 656–58. But aside from establishing these general parameters and some specified limitations, *see id.* at 672–81 (general provisions), the appropriation statute gives the agency discretion to determine which proposed research projects should be funded.[1] And in exercising that

---

[1] Plaintiffs cite 42 U.S.C. § 283p. (Br. 28.) But that statute merely directs the NIH director to, "as appropriate, encourage efforts to

*Continued on next page.*

discretion, the Secretary may consider national policy requirements for grants, including "statutory, *executive order*, other Presidential directive, or regulatory requirements" that apply. 2 C.F.R. § 200.211(c)(1)(ii) (emphasis added)[2]; *see Morton*, 415 U.S. at 230.

As this point illustrates, there are at least some circumstances in which an agency could lawfully implement a directive to avoid funding the specific interventions at issue here for children, and plaintiffs cannot satisfy their significant burden to prevail on their facial challenge to these provisions. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) ("This Court has ... made facial challenges hard to win.").

The same points also underscore the error in plaintiffs' reliance on *City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018). As we explained (Opening Br. 33–35), in *San Francisco*, this Court affirmed an injunction against an executive order that instructed

---

improve research related to the health of sexual and gender minority populations." Nothing in the statute references federal grants or funding, much less requires the agency to fund the particular interventions at issue here.

[2] The government's opening brief cites another regulation with identical language, 45 C.F.R. § 75.210(b)(1)(ii), that was effective until September 30, 2025.

certain federal officials to cut off federal funding to states and localities that did not comply with a federal statute. In doing so, the Court emphasized that it read the order as directing agencies to withhold all federal funding of any type from certain states and localities (regardless of the funds' connection to the statute at issue), particularly given that the order contained an exception for law enforcement-related grants, for which certain agencies had already taken action to impose conditions on funds before the order issued. *City & County of San Francisco v. Trump*, 897 F.3d at 1238–39, 1238 n.6. And there, the government made no argument that the order might be permissibly applied to other grant programs.

None of that is true here. We have described at length circumstances in which the Orders might be applied. Plaintiffs urge that the government does not "point to any language in the Orders here exempting any federal funding from the Orders' commands" (Br. 24), but that ignores that the Protecting Children EO directs agencies to consider "appropriate steps" only as to "research or education grants to medical institutions," § 4. Similarly, plaintiffs' criticism that the Orders do not use the term "discretion" (Br. 24-25) ignores that the Orders

17

direct "appropriate" or "necessary" steps, which must necessarily be determined by each agency in the exercise of its discretion. Protecting Children EO § 4; Defending Women EO § 3(e). And plaintiffs' repeated assertion that the Orders caused immediate action from agencies (*e.g.* Br. 9) ignores that plaintiffs are not challenging those actions, which were in any event rescinded.

Ultimately, plaintiffs' arguments on this score only illustrate the prematurity of their suit. If the President's authority to supervise and direct the actions of federal agencies means anything, it must mean that he can direct them to determine how to carry out his policy objectives consistent with law. As discussed in greater detail below, after the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), there can be no doubt that it is reasonable for the federal government to determine that there are concerns with administering the sex-transition interventions at issue here to children. Whether and how agencies can address those concerns through particular grants or funding decisions is a question for those agencies to determine in the first instance—subject, of course, to challenge based on alleged noncompliance with specific statutory requirements. In the

18

meantime, "the mere possibility that some agency might make a legally suspect decision to … deny funding" based on the Executive Orders "does not justify an injunction." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

Finally, there is no merit to plaintiffs' last-ditch argument (Br. 27–30) that federal decisions about grant funding somehow "dictate the practice of medicine." This contention is largely redundant as a rehash of plaintiffs' contention that the government has not identified "an 'unambiguous' authorization from Congress … to condition fund[s] in this manner." (Br. 29.) But the argument fails even on its own terms. The Orders do not purport to make unlawful the provision of these interventions to children or otherwise to preclude States from allowing such interventions to occur. The only relevance of the Orders here is to decisions the federal government would make about how federal funds are spent. The federal government makes countless decisions about what medical research and other projects to fund or not fund in a given year, and those choices may reflect shifting priorities of all kinds. For example, for a period of time the federal government restricted the funding of research projects involving certain stem cell research. *See*

19

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011). Whatever effects those choices might have about the sorts of activities hospitals and medical schools engage in, it has never been thought that such decisions constitute regulation of the practice of medicine.

**B. The Executive Orders Do Not Violate Equal Protection**

**1. The Executive Orders do not discriminate based on sex or transgender status**

*United States v. Skrmetti*, 605 U.S. 495 (2025), forecloses plaintiffs' argument that the Executive Orders classify based on sex and transgender status in violation of the Fifth Amendment's equal protection guarantee. Like the Tennessee statute in *Skrmetti*, the Executive Orders here, at most, make classifications based on age and medical use by focusing on specific forms of medical interventions for children under age 19. Classifications based on age and medical use are subject to rational basis review. *Id.* at 511.

**2. The Executive Orders easily survive rational basis review**

The Executive Orders' classifications based on age and medical use easily survive rational basis review for the reasons we explained. (Opening Br. 52–57.) In short, rational basis review simply asks

20

whether there is "any reasonably conceivable state of facts that could provide a rational basis for the classification," and "where there exist plausible reasons for the relevant government action," the court's "inquiry is at an end." *Skrmetti*, 605 U.S. at 522. And in *Skrmetti*, the Supreme Court made clear that there is a rational basis for a state to altogether ban the medical interventions at issue here for minors, noting concerns that interventions may have "irreversibl[e]" and long-term effects, that minors may "lack the maturity to fully understand and appreciate the life-altering consequences of such procedures," and that there remains "medical and scientific uncertainty" about the risks and benefits of some interventions for minors. *Id.* at 522–24; *see id.* at 533–40 (Thomas, J., concurring) (citing studies about the risks associated with the use of puberty blockers, hormones, and surgery to address gender dysphoria). Given that these justifications allow a state to ban such interventions for minors entirely, it follows that there is an equally rational basis for the far less intrusive instructions here, which simply direct federal agencies to avoid funding such interventions for children to the extent of their lawful authority.

Plaintiffs largely ignore *Skrmetti*'s analysis on this point and, unsurprisingly, do not contend that they can demonstrate the Orders fail ordinary rational basis review. They instead argue (Br. 49–54) that the Orders are the product of "anti-trans animus." But to succeed on that theory, plaintiffs much show that the Orders cannot "reasonably be understood to result from a justification independent of unconstitutional grounds." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018). Given *Skrmetti*'s express recognition of such permissible justifications, which are likewise invoked in the Orders themselves, plaintiffs cannot possibly meet that burden. Indeed, in just the last three years more than 20 States have enacted laws banning the provision of these or similar interventions to children because of such concerns. *Skrmetti*, 605 U.S. at 504. As explained in our opening brief (at 57), the Defending Women EO was further motivated by the government's legitimate concern for protecting the "dignity, safety, and well-being" of women in general, including protecting women's privacy in "intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." Defending Women EO § 1. It is thus plain that the Orders here have a basis "quite

22

apart from any [animus]" and that "it cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" *Hawaii*, 585 U.S. at 706; *see also Trump v. Orr*, No. 25A319, 2025 WL 3097824, at *1 (U.S. Nov. 6, 2025).

### 3. Plaintiffs' attempt to distinguish *Skrmetti* is unavailing

Perhaps recognizing that they cannot prevail under *Skrmetti*, plaintiffs primarily contend that this Court should ignore *Skrmetti*'s application of rational-basis review and instead apply heightened scrutiny. But their efforts to escape *Skrmetti*'s logic are unpersuasive. First, plaintiffs argue that the Executive Orders discriminate based on "transgender status" because they "do not target particular treatments" but instead "target particular people." (Br. 38.) The Supreme Court rejected the same argument in *Skrmetti*, 605 U.S. at 517–19. Like the Tennessee law in *Skrmetti*, the Protecting Children EO addresses the use of puberty blockers, cross-sex hormones, and certain surgical procedures to perform sex-transition interventions (a classification based on medical use) on children under age 19 (a classification based on age). *See* Protecting Children EO § 2(c). The fact that "only

transgender individuals seek" such sex-transition interventions does not alter this conclusion because there is still a "lack of identity" between transgender status and the covered interventions, given that some but not all trans-identifying individuals may seek such interventions. *Skrmetti*, 605 U.S. at 519.

In arguing otherwise, plaintiffs advance the same implausible interpretation of the Protecting Children EO that the district court adopted, contending that it targets the use of puberty blockers only by trans-identifying children "whether or not the medication is provided in connection with gender-affirming care." (Br. 38.) Under plaintiffs' reading, "a cisgender teen who needs puberty blockers in the course of cancer treatment could receive them," "but a transgender teen who needs puberty blockers due to the same [cancer] diagnosis ... could not." (Br. 38.) We explained in our opening brief why that interpretation is implausible based on the Order's text, its objective, and its policy, all of which confirm that the Order addresses the use of puberty blockers as a sex-transition intervention and does not implicate their use in treatments unrelated to "gender affirming care," such as treatments for cancer or other diseases. (Opening Br. 46–47.) The same implausible

24

understanding of "gender affirming care" undergirds plaintiffs' suggestion (Br. 38–39) that the Order would apply to an 18-year-old biological male seeking a vasectomy. And to the extent any ambiguity remains about how the Order would be applied by agencies in practice, that only underscores the prematurity of this suit.

*Skrmetti* also forecloses plaintiffs' argument that the Protecting Children EO classifies based on sex (not medical use) because the "sex of the patient is the basis on which [it] distinguishes between medical interventions that are restricted … versus those that are not." (Br. 39.) This is no different from the argument rejected in *Skrmetti* that the Tennessee law there "create[d] facial sex-based classifications by defining the prohibited medical care based on the patient's sex." 605 U.S. at 511. As *Skrmetti* explained, this argument "contort[s] the meaning of the term 'medical treatment'" by ignoring "the underlying medical concern the treatment is intended to address." *Id.* at 513. "When, for example, a transgender boy (whose biological sex is female) takes puberty blockers to treat his gender incongruence, he receives a different medical treatment than a boy whose biological sex is male who takes puberty blockers to treat his precocious puberty." *Id.* at 513–14.

The same is true here. The Protecting Children EO addresses the use of puberty blockers, cross-sex hormones, and surgeries on *children* for certain *medical uses* involving sex-transition interventions, regardless of the child's sex. And for the same reasons, *Skrmetti* disposes of plaintiffs' contention that the Orders are "covertly based on gender." (Br. 40.) As the Supreme Court explained, classifications based on age and medical use do not "prohibit conduct for one sex" that is "permit[ted] for the other." 605 U.S. at 514–15.

As for the Defending Women EO, it makes no classifications based on anyone's status. The challenged provisions direct federal agencies to take steps (as permitted by law) to "end the Federal funding of gender ideology" and to "ensure grant funds do not promote gender ideology." § 3(e) and (g). The district court nevertheless interpreted that language as conditioning funding "*based on* whether grant recipients offer … gender-affirming services for individuals with gender dysphoria" (ER-35) and thus held that the Defending Women EO discriminates based on transgender status for the same reason that the Protecting Children EO does (ER-36). Even crediting that remarkable series of textual leaps, the end result is equally irreconcilable with *Skrmetti*'s holding

that laws regulating sex-transition interventions to address gender dysphoria do *not* classify based on transgender status, but rather classify based on medical use. 605 U.S. at 517–19. Insofar as the district court treated the two Executive Orders as identical in this respect, its rationale is equally flawed.

Plaintiffs' argument (Br. 42) that "*Skrmetti* does not overrule this Court's precedents" in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (per curiam), and *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), *cert. granted*, 145 S. Ct. 2871 (2025), is beside the point. Plaintiffs are correct that "*Skrmetti* did not address whether transgender people constitute a quasi-suspect class warranting heightened scrutiny under equal protection analysis." (Br. 42.) But *Skrmetti* explained that it had no occasion to address that question precisely because the law at issue there did "not classify on the basis of transgender status," instead classifying based on "age" and "medical use." 605 U.S. at 517. To the extent plaintiffs rely on *Karnoski* or *Hecox* for the proposition that the Orders here classify on some basis *other* than age or medical use (Br. 39–40), that argument is mistaken for the reasons already discussed;

27

the Executive Orders here are materially indistinguishable from the Tennessee law upheld in *Skrmetti*.[3]

Finally, as our opening brief explained (at 55–57), even if heightened scrutiny applied, the same considerations already discussed would suffice to satisfy that standard. It is undisputed that the use of puberty blockers and cross-sex hormones to address gender dysphoria in children carries known health risks and may have irreversible effects, including infertility. *Skrmetti*, 605 U.S. at 533–35 (Thomas, J., concurring) (citing studies). Sex-transition surgeries for girls, including "the surgical removal of the breasts" and "phalloplasty" (that is, an "attempt to create a pseudo-penis by transplanting a roll of skin and subcutaneous tissue from another area of the body to the pelvis"), and for boys, including "removal of the testicles" and "surgically opening the boy's penis, removing erectile tissue, and then closing and inverting the penis into a newly created cavity in order to simulate a vagina," obviously are irreversible and can result in permanent infertility. *Id.* at 535–36 (cleaned up). Whether children have the maturity to give

---

[3] As noted in our opening brief (at 50–51), the government's position is that trans-identifying individuals are not a suspect class, but the Court need not reach that question here.

28

informed consent to such life-altering sex-transition interventions is doubtful. *Id.* at 540–43; *see* Amicus Br. of Detransitioners, Dkt. 19.1 (filed May 27, 2025). These concerns for the long-term health and welfare of children thus provide ample basis for the Orders here.

Plaintiffs devote much of their argument on this score to expounding their views about the safety and effectiveness of sex-transition interventions for children. (Br. 44–46.) Although plaintiffs would strike the balance between the risks and benefits of these interventions differently, they cannot seriously dispute that "fierce scientific and policy debates about the safety, efficacy, and propriety of [these interventions] in an evolving field" remain and are ongoing, and the "voices in these debates raise sincere concerns." *Skrmetti*, 605 U.S. at 525. Plaintiffs ask this Court to ignore the Supreme Court's recognition of "medical and scientific uncertainty" in this area, including "open questions regarding basic factual issues" about the associated risks and benefits, *id.* at 523–25, in favor of the views of one side of those issues. For example, plaintiffs rely on guidelines published by the World Professional Association for Transgender Health (WPATH), but even assuming those guidelines reflect objective medical

judgment, *but see Skrmetti*, 605 U.S. at 543–46 (Thomas, J., concurring) ("Recent revelations suggest that WPATH … bases its guidance on insufficient evidence and allows politics to influence its medical conclusions."); Amicus Br. of State of Alabama and 24 other States, Dkt. 37.1 (filed Aug. 1, 2025), those guidelines change regularly, and the current guidelines recognize known risks associated with sex-transition interventions for adolescents, as well as "limited data" on "the long-term physical, psychological, and neurodevelopmental outcomes in youth," *Skrmetti*, 605 U.S. at 503–04. Additionally, "health authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors." *Id*. at 505 (discussing studies by Finland, England, Sweden, and Norway).

Aside from pressing one side of the scientific and medical debate, plaintiffs merely parrot the district court's conclusions about the purported mismatch between the Orders and the concerns the orders address. (Br. 46–48.) Those assertions were addressed in our opening brief (at 55–56), and plaintiffs offer nothing new on that score.

## II. Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors

Plaintiffs also fail the other preliminary injunction factors. (Opening Br. 58–60.) They cannot demonstrate irreparable harm because none of the federal grant recipients owned or operated by the plaintiff states or for whom the plaintiff physicians work have had their funding terminated, withheld, or even threatened by any federal agency action under the Executive Orders. The district court acknowledged that "the loss of funds has not yet materialized [and] enforcement of the Orders has not yet occurred." (ER-14.) Plaintiffs can thus only speculate that an agency might act unlawfully to withhold or terminate any grants they receive, notwithstanding the Executive Orders' clear directives that agencies comply with the law in taking appropriate steps to end federal funding of gender ideology and sex-transition interventions for children. And plaintiffs' claims of irreparable harm from the Orders to patients at state-operated facilities or at the one hospital where the physician plaintiffs work (*see* ER-67) are even more speculative: those facilities at present face no "Sophie's choice" (Br. 55) because no agency has taken, or proposed to take, any action with respect to any of their funding, and they could sue to obtain relief if any

31

allegedly unlawful action were actually taken in the future. Plaintiffs cannot obtain relief based on a "possibility of irreparable harm," but must instead show such harm is "likely in the absence of an injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis omitted).

At the same time, the irreparable harm analysis would properly take into account the concerns about the interventions at issue here identified in *Skrmetti* and the Protecting Children EO, including the risks these interventions pose for children who may have less capacity to provide informed consent to sometimes irreversible procedures. And more generally, the government is irreparably harmed by the district court's injunction, which "improper[ly] intru[des] … into the workings of a coordinate branch of the Government" by undermining the President's ability to supervise and direct the work of subordinate officials. *INS. v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993).

## III. At Minimum, the District Court's Multi-Statewide Injunction Is Overbroad

The district court entered a multi-statewide injunction, covering all four plaintiff states and granting relief to nonparties within the

states, because it thought that nonparty "providers throughout the Plaintiff States would be equitably served by an injunction barring enforcement of the … Executive Orders." (ER-57.) That overbroad injunction was an abuse of discretion that cannot be reconciled with *Trump v. CASA, Inc.*'s ruling that the equitable authority of district courts is limited to "administer[ing] complete relief *between the parties*." 606 U.S. 831, 851 (2025). Providing relief to nonparty healthcare providers throughout the plaintiff states "would not render [the parties'] relief any more complete." *Id.* at 853. Therefore, the injunction should at a minimum be narrowed to apply only to grant recipients owned or operated by one of the plaintiff states and grant recipients where the plaintiff physicians provide services.

Plaintiffs do not dispute that the relief the district court entered would extend beyond the parties here. They instead chiefly contend broad relief is appropriate because they are unable to ascertain for whom relief is necessary, for example because "care teams may shift" or the arrival of "new providers" may be delayed. (Br. 61–62.) Of course, any "new providers" or care team members may or may not receive *any* federal grants that might be subject to some future action taken by an

33

agency pursuant to the Orders here, so the application of the Orders to such unknown parties is entirely speculative.

More generally, that approach gets matters backwards:  to the extent plaintiffs are unable to identify for whom they need relief, that is a strong indication that such relief is inappropriate.  Indeed, the Supreme Court rejected a similar argument in *CASA* itself, where a membership association urged that it needed universal relief because it had members spread nationwide.  *See CASA*, 606 U.S. at 861; *see also id*. at 864 (Thomas, J., concurring).  And *CASA* further illustrates that, to the extent plaintiffs actually seek to obtain relief running to non-parties, they would be free to seek class certification, but they have not done so here.  In the meantime, plaintiffs have provided no basis to believe that providing relief to the plaintiffs here—for example, three physicians who all practice in Seattle (ER-67)—requires extending injunctive relief to address nonparty health providers in Spokane, hundreds of miles away, or in one of the other three plaintiff states.

## CONCLUSION

For the foregoing reasons and those explained in appellants' opening brief, this Court should vacate the preliminary injunction.  At

34

minimum, the Court should limit the scope of the injunction to the named plaintiffs.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney*
    *General*

BRAD HINSHELWOOD

*s/ Jacob Christensen*
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
  *jacob.christensen@usdoj.gov*

December 2025

35

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains <u>6,639</u> words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Jacob Christensen*
Jacob Christensen